# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

|  |  |
|---|---|
| **JEFFREY ZULAUF, JASON ZULAUF, KAL WAYMAN, on behalf of themselves and all similarly situated individuals,**<br><br>    **Plaintiffs,**<br><br> **v.**<br><br>**AMERISAVE MORTGAGE CORPORATION and PATRICK MARKERT, individually,**<br><br>    **Defendants.** | **1:11-cv-1784-WSD** |

## OPINION AND ORDER

This matter is before the Court on Defendant Amerisave Mortgage Corporation's ("Amerisave") Motion for an Order Compelling Arbitration on an Individual Basis, Striking Class Allegations, and Staying Action [17]. Also before the Court is Plaintiffs' Motion for Conditional Certification [21].

## I. BACKGROUND

This case is about alleged violations by Amerisave of the overtime provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207. Amerisave is a retail mortgage lender headquartered in Atlanta, Georgia. (Poupart Decl. [32-

25] ¶ 4). Jeffrey Zulauf, Jason Zulauf, and Kal Wayman formerly worked for Amerisave as Senior Mortgage Processors ("SMPs"). Plaintiffs allege that during the past three years they routinely worked overtime at Amerisave without receiving overtime compensation. (Compl. ¶¶ 34-36). They seek to represent a collective class consisting of all current and former Amerisave employees who worked as SMPs and were not paid overtime to which they were entitled. (Compl. [1] ¶¶ 6, 18). Plaintiffs assert that there are over one hundred current SMPs, (e.g., Chiofalo Decl. [21-9] ¶ 3), and probably there are a few hundred former SMPs. To date, 27 additional plaintiffs have filed consents to opt into this action.[1]

*SMP Job Duties*

Amerisave's business involves advertising and selling mortgage loans direct to the public. (Poupart Decl. ¶ 5). This operation is divided between the call center and outside sales. (Id.). The outside sales department directly solicits business. (Id.). This case involves the call center, which provides services to customers who contact Amerisave. (Id.).

Plaintiffs are SMPs who staff the call center. (Id. ¶ 6). SMPs provide assistance to customers before and after they apply for a loan. (E.g., Brown Decl. [32-2] ¶¶ 3-4). Before the loan application, SMPs help "navigat[e] potential

---

[1] The Court uses the generic term "Plaintiffs" to refer to both the named Plaintiffs and the opt-in Plaintiffs.

customers through [Amerisave's] website so that they can apply for a loan." (Id. ¶ 3). The SMPs "provide customer service, act as a point of contact for customers and collect documents needed to process loans." (Id.). SMPs do not take loan applications or discuss rates or fees. (Id.). Once a customer initiates a loan process, SMPs "work with the customer to help gather documents to complete the loan process." (Id. ¶ 4).

A few SMPs work in Amerisave's Atlanta headquarters but most work directly from their home, and there are SMPs working from nearly every state in the contiguous United States. (A. Watts Decl. [32-24] ¶ 4). To perform their job duties from home or Amerisave's office, SMPs must log onto special software provided by Amerisave, which Amerisave refers to as its Customer Relationship Management System ("CRM System"). (Brown Decl. ¶ 4; Bass Decl. [32-19] ¶ 3). Once SMPs enter into this system, they are able to interact with potential or current Amerisave customers that are assigned to the SMP by the CRM System in one of two ways. Sometimes, SMPs receive chat messages from a customer browsing Amerisave's website, and the SMP will interact with the customer by typing messages through the chat interface. (Poupart Decl. ¶ 6).

More commonly, SMPs receive incoming phone calls from customers or potential customers. This occurs when a customer calls Amerisave's general sales

phone number, which routes the call through the CRM System to one of the SMPs currently logged onto the system. (Brown Decl. ¶ 4; Bass Decl. ¶ 6). SMPs cannot communicate with customers or perform their duties without being logged into Amerisave's CRM System. (Id.).

SMPs are divided into teams and each team has a different manager. (Poupart Decl. ¶ 7). Over the past two years there have been eleven different teams with eleven different managers. (Id.). Each SMP is assigned to one team and typically only interacts with the manager of that team. (Id.). A typical SMP team may have between 15 and 40 SMPs. (Pityer Decl. [32-20] ¶ 2; J. Watts Decl. [32-21] ¶ 2).

*SMP Work Schedule And Compensation*

SMPs are paid a minimum wage draw plus commissions based on the quantity of loans they process. (A. Watts Decl. ¶ 5). Over the past few years, SMPs have earned between $30,000 and $150,000. (Id.).

The SMP position is a fulltime position requiring employees to work 40 hours a week. (Poupart Decl. Ex. 1). Amerisave has a policy prohibiting SMPs from working overtime without authorization from their manager. (Brown Decl. ¶ 5). One some occasions, however, SMPs have reported working overtime hours and were paid for their overtime hours. (E.g., A. Watts Decl. ¶ 6). Named

Plaintiff Jason Zulauf, for example, worked and was paid for 28 hours of overtime the week before he resigned. (Id.; Jason Zulauf Decl. dated Sept. 16, 2011, ¶ 7).[2] Other SMPs have submitted declarations on behalf of Amerisave stating that they occasionally worked overtime and that they were paid for all the overtime hours they worked. (E.g., Brown Decl. ¶ 10; Gomez Decl. ¶ 10; M. McCone Decl. ¶ 11; R. McCone Decl. ¶ 11; Metzger Decl. ¶ 11; Lutz Decl. ¶ 11; Clark Decl. ¶ 11).

Amerisave's CRM System contains a timesheet application that employees use to record the hours they work. (Poupart Decl. Ex. 1). When employees log into the CRM System, they only became active and able to perform their job duties when they are "clocked-in." (Id.). Once the CRM System registers that an SMP has worked forty hours in a given workweek, the SMP is automatically locked out of the system and prevented from working unless they gain approval to work overtime. (Id.). Even when they are locked out of the system, though, SMPs have the ability to change their timecard to reflect time they worked while not logged into the CRM System or time they were logged into the system but not working. (Bass Decl. ¶ 4; Pityer Decl. ¶¶ 3-4).

---

[2] In their Reply in support of their Motion to Conditionally Certify this case as a collective action, Plaintiffs allege for the first time that Amerisave incorrectly calculated the amount of overtime that it paid.

Amerisave also has a policy forbidding employees from underreporting hours. The time reporting policy states: "It is not acceptable to under-report hours; you must record all hours you are working on Amerisave business." (Poupart Decl. Ex. 1).[3] SMPs are required to certify the accuracy of their timesheets each workweek. (Jeffrey Zulauf Certification dated May 16, 2011, Bass Decl. Ex. 1). The certification form states that it "is required to be completed each workweek to help ensure compliance with company, state and federal regulations." (Id.) The form asks the employee, "Did you keep *accurate records* of your work on behalf of Amerisave?" (Id.). The form ends: "By typing your name below, you certify that you have provided truthful responses to all questions on this Compliance Certification." (Id.).

Plaintiffs allege that they engaged in a pattern of falsifying their timesheets to underreport their hours worked and of falsely certifying the accuracy of their time sheets. (See, e.g. Compl. ¶ 23; McCallahan Decl. ¶ 9). As a result of these unreported hours, Plaintiffs allege that they worked overtime hours for which they were never compensated. (E.g., Chiofalo Decl. ¶¶ 12-13). Fifteen Plaintiffs submitted declarations suggesting why they underreported their hours.

---

[3] Amerisave has provided no information about how long the stated time-reporting policy has been in effect.

One of the opt-in Plaintiffs alleges he was induced to falsify his records because "[m]anagment encouraged [him] to work long hours," because he was "informed . . . that if [he] worked longer hours, [he] would get more and better potential [customer] leads," and because "[m]anagement . . . [made] it clear verbally that we were expected to work as many hours as necessary to close loans." (Wong Decl. [21-3] ¶¶ 9-10). Another eleven Plaintiffs only state that they were subject to termination if they did not meet certain sales goals. (E.g., Wolffs Decl. [21-10] ¶ 14). Finally, two Plaintiffs directly assert they were "told by management . . . that [they] should log back into the system and erase previous time records in order to work more than 40 hours in a week." (Blattman Decl. [21-4] ¶ 9; McCallahan Decl. [21-6] ¶ 9).[4] The declarations and pleadings do not clarify to whom the opt-in Plaintiffs are referring when they use the term "management."

Plaintiffs also allege that Amerisave knew about the unreported overtime. Eleven of the declarations submitted by Plaintiffs state: "My manager informed me that he was able to see my activity hours in the system." (E.g., Goicochea ¶ 15).

---

[4] The Blattman and McCallahan declarations are nearly identical to the Wong declaration. That is, they also allege that they were encouraged to "work long hours" and that they were told "to work as many hours as necessary to close loans." The fifteenth opt-in Plaintiff does not allege that he was encouraged or pressured to work unreported overtime or that his manager knew or could have known about his overtime hours. (See DeMaria Decl. [21-5]).

Plaintiffs argue that the ability to monitor "activity hours" gives Amerisave the ability to detect when SMPs work for more hours than they report on their timesheets.[5]

Amerisave responds with declarations of 15 SMPs who state that they never worked overtime hours for which they were not compensated, that they were never encouraged to work unreported overtime hours, and that they were told not to falsify their time records. (E.g., Brown Decl. [32-2] ¶¶ 5, 7, 10-14; Gomez Decl. [32-3] ¶¶ 5, 10-14).[6] Of those, eight SMPs state that they have occasionally worked overtime and that Amerisave paid them overtime compensation for the overtime hours that they worked.[7] Amerisave has also provided declarations from several managers of SMP teams, who state that they never told, encouraged, or pressured SMPs to falsify their time records. (E.g., Pityer Decl. ¶ 3; J. Watts Decl. ¶ 4). They further state that they have never been directed by Amerisave to not pay overtime, that they do not have an overtime or labor budget, and that their

---

[5] Plaintiffs also seem to suggest that the declarations by three opt-in Plaintiffs stating that they were encouraged to work long hours and expected to work as many hours as possible to close loans suggests that Amerisave knew or should have known that those Plaintiffs were working overtime. (See Wong Decl.; Blattman Decl.; McCallahan Decl.). Of those three opt-in Plaintiffs, the statements by two of them that they were directly told to falsify their timesheets also supports that Amerisave had knowledge of the overtime. (See Blattman Decl.; McCallahan Decl.).

[6] (See generally ECF Nos. 32-2 to 11, -14 to -18, 33-1, 33-2).

[7] (See ECF No. 32-2 to -8, -17).

compensation is not affected if employees work overtime.  (<u>E.g.</u>, Pityer Decl. ¶¶ 5-6; J. Watts Decl. ¶¶ 6-7).

*Arbitration Agreements*

This case currently involves 3 named Plaintiffs and 27 opt-in Plaintiffs.  Of these 30, 18 Plaintiffs—named Plaintiff Kal Wayman and 17 opt-in Plaintiffs—entered into written compulsory arbitration agreements.[8]

Fourteen Plaintiffs signed employment agreements (collectively, the "Employment Agreement") when they started their employment with Amerisave.  The Employment Agreement states: "As provided in the Employment Terms and Conditions, Employee agrees that all disputes between Employee and [Amerisave] shall be settled by Arbitration.  Both parties expressly waive their right to a jury trial."  (Compton Decl. [17-2] Ex. 1, No. 8).  Plaintiff Wayman signed his Employment Agreement on July 19, 2004.  (Compton Decl. ¶ 2 & Ex. 1).  The Employment Terms and Conditions, which are incorporated into the Employment Agreement, provide:

---

[8] For two others, it is unclear whether they signed arbitration agreements because their consents to join this action were filed after the motion to compel arbitration was fully briefed by the parties.  Amerisave states that its records indicate that four other opt-in Plaintiffs never worked as SMPs for Amerisave, (A. Watts Decl. ¶ 9).  The Court notes that Amerisave misspells Stephanie Morgado's name as "Murgado," so it is unclear whether Amerisave's statement that "Murgado" did not work for Amerisave refers to the "Stephanie Morgado" who opted into this action.

If an employment dispute arises while you are employed at Amerisave, Amerisave requests that you agree to submit any such dispute arising out of your employment or the termination of your employment (including, but not limited to, claims of unlawful termination based on race, sex, age national origin, disability, breach of contract or any other bias prohibited by law) exclusively to binding arbitration under the federal Arbitration Act, 9 U.S.C., Section 1. Similarly, any disputes arising during your employment involving claims of unlawful discrimination or harassment under federal or state statutes shall be submitted exclusively to binding arbitration under the above provisions. This arbitration shall be the exclusive means of resolving any dispute arising out of your employment or termination from employment by Amerisave or you, and no other action can be brought by employees in any court or any forum.

By simply accepting or continuing employment with Amerisave, you automatically agree that arbitration is the exclusive remedy for all disputes arising out of, or related, to your employment with Amerisave and you agree to waive all rights to a civil court action regarding your employment and the termination of your employment with Amerisave; only the arbitrator, and not a judge nor a jury, will decide the dispute.

If you decide to dispute your termination or any other alleged incident during your employment, including but not limited to unlawful discrimination or harassment, you must deliver a written request for arbitration to Amerisave within one (1) year from the date of termination, or one (1) year from the date on which the alleged incident(s) or conduct occurred, and respond within fourteen (14) calendar days to each communication regarding the selection of an arbitrator and the scheduling of a hearing. If Amerisave does not receive a written request for arbitration from you within one (1) year, or if you do not respond to any communication from Amerisave about the arbitration proceedings within fourteen (14) calendar days, you will have waived any right to raise any claims arising out of the termination of your employment with Amerisave, or involving claims of unlawful discrimination or harassment, in arbitration and in any court or other forum.

You and Amerisave shall each bear respective costs for legal representation at any such arbitration. The cost of the arbitrator and court reporter, if any, shall be shared equally by the parties. All arbitration hearing shall be held in Atlanta, Georgia.

(Farahany Decl. dated Aug. 1, 2011 [22-1] Ex. 1).

Four opt-in Plaintiffs signed forms acknowledging they had received

Amerisave's Employee Manual (collectively, the "Acknowledgment"). The

Acknowledgment that these employees signed states:

I also acknowledge I have read and understand the Arbitration Policy contained in the Employee Manual and I agree to abide by the policy and by its conditions. In accordance with Amerisave's Arbitration Policy, that [sic] I will submit any dispute—including but not limited to my termination—arising under or involving my employment with Amerisave to binding arbitration within one (1) year from the date the dispute first arose. I agree that arbitration shall be the exclusive forum for resolving all disputes arising out of or involving my employment with Amerisave or the termination of that employment. I agree that I will be entitled to legal representation, at my own cost, during arbitration. I further understand that I will be responsible for half of the cost of the arbitrator and any incidental costs of arbitration.

(Id. Ex. 15).

On May 31, 2011, the named Plaintiffs commenced this lawsuit. On

July 14, 2011, Defendants sought to compel those named and opt-in Plaintiffs

subject to compulsory arbitration agreements to arbitrate their claims. On July 29,

2011, Plaintiffs moved to conditionally certify a class of opt-in plaintiffs.

## II.    DISCUSSION

### A.    Motion To Compel Arbitration

Amerisave moves the Court to compel those plaintiffs subject to compulsory

arbitration to arbitrate their FLSA claims.  The Federal Arbitration Act ("FAA")

provides:

> A written provision in . . . a contract evidencing a transaction
> involving commerce to settle by arbitration a controversy thereafter
> arising out of such contract or transaction, or the refusal to perform
> the whole or any part thereof, or an agreement in writing to submit to
> arbitration an existing controversy arising out of such a contract,
> transaction, or refusal, shall be valid, irrevocable, and enforceable,
> save upon such grounds as exist at law or in equity for the revocation
> of any contract.

9 U.S.C. § 2.  If a party files a case in federal court based "upon any issue referable

to arbitration under an agreement in writing for such arbitration," the court "shall

on application of one of the parties stay the trial of the action" pending arbitration,

once the court is "satisfied that the issue involved . . . is referable to arbitration."

Id. § 3.  The FAA has been interpreted to create "a strong federal policy in favor of

arbitration," and as such courts "rigorously enforce arbitration agreements."

Picard v. Credit Solutions, Inc., 564 F.3d 1249, 1253 (11th Cir. 2009) (internal

quotation marks omitted).  For this reason, "[q]uestions of arbitrability must be

addressed with a healthy regard for the federal policy favoring arbitration."  Id.

(internal quotation marks omitted).

There is no doubt that the arbitration agreements in this case are subject to the FAA. The arbitration agreements are clearly "written provision[s] in . . . a contract," as the FAA requires. 9 U.S.C. § 2. The FAA "generally applies to contracts of employment except those involving 'transportation workers.'" Caley v. Gulfstream Aerospace Corp., 428 F.3d 1359, 1367 (11th Cir. 2005). "Further, courts have consistently found that claims arising under federal statutes may be the subject of arbitration agreements and are enforceable under the FAA." Id. Our Circuit has observed that compulsory arbitration agreements are common in the workplace and that the requirement to arbitrate rather than litigate federal statutory rights does not itself raise a problem. See id.

Under the FAA, arbitration agreements have the same force and effect as other contracts under state law. Id. at 1367-68; see 9 U.S.C. § 2 (arbitration agreements are valid and enforceable "save upon such grounds as exist at law or in equity for the revocation of the contract"). A court must therefore look to state law to determine whether an enforceable arbitration agreement exists. Id. at 1368. The FAA, however, preempts state law to the extent it treats arbitration agreements differently than other contracts, and courts also must apply state law in light of the strong federal policy favoring arbitration. See id. at 1367-68.

Plaintiffs do not argue that the signed Employment Agreements or Acknowledgments are not valid, binding contracts and there does not appear to be any valid grounds for arguing that the Employment Agreements and Acknowledgment are not binding. Caley, for example, involved a mandatory arbitration agreement similar in all material respects to the employment agreements at issue here. The arbitration agreement in Caley contained the following language: "The submission of an application, acceptance of employment or the continuation of employment by an individual shall be deemed to be acceptance of the [arbitration agreement]." 428 F.3d at 1364-65. The Eleventh Circuit concluded that this language met the basic criteria under Georgia law to form a binding contract: offer, acceptance, and consideration. Caley, 428 F.3d at 1373-77. The language manifested a willingness to enter into a bargain, stated the terms, and explained the means of accepting; the employees accepted the offer through their continued employment; and the mutual promises embodied in the contract constituted consideration. Id.

In this case, the language of the agreements also demonstrates an intention to enter into a bargain about the nature of the parties' employment relationship. By continuing their employment, employees received consideration for their agreement that "all disputes" will be subject to arbitration. See Caley, 428 F.3d at

1373-77; <u>Blair v. Scott Specialty Gases</u>, 283 F.3d 595, 603-04 (3d Cir. 2002)

(applying Pennsylvania law, finding that employee signing acknowledgment of

receipt of employee handbook containing arbitration agreement was sufficient to

form binding contract to arbitrate employment disputes).[9]  Plaintiffs have not

submitted any arguments or case law that would suggest that other states would

apply these basic contract principles any differently to the arbitration agreements at

issue here.

There also is no doubt that this dispute is covered by the arbitration

agreements.  Under the agreements, arbitration is required for "any dispute arising

out of your employment or termination," (Employment Agreement), and "any

dispute—including but not limited to my termination—arising under or involving

my employment," (Acknowledgment).  This language clearly applies to the

overtime disputes in this case.

Courts must examine the initial enforceability of arbitration agreements that

implicate federal statutory rights.  This examination raises questions of both

_____

[9] Some courts have further held that continued employment may serve as consideration that creates a binding contract.  <u>See</u> <u>Caley</u>, 428 F.3d at 1374 (noting that under Georgia law, employee can accept new terms of employment of which the employee is aware by remaining in employment); <u>Hightower v. GMRI, Inc.</u>, 272 F.3d 239, 243 (4th Cir. 2001) (noting that under North Carolina law, continued employment with knowledge of employer's arbitration program is sufficient to form binding agreement to arbitrate).

federal and state law.  The federal question asks whether under the arbitration

agreement "prospective litigant[s] effectively may vindicate [their] statutory cause

of action in the arbitral forum."  Green Tree Fin. Corp.-Ala. v. Randolph, 531 U.S.

79, 90 (2000).  The state law question is whether there are generally applicable

state law grounds, such as unconscionability or fraudulent inducement, which

specifically apply to the arbitration provision and render it unenforceable.

### 1. *Vindication Of Federal Statutory Rights*

"[C]laims arising under a statute designed to further important social

policies may be arbitrated because 'so long as the prospective litigant effectively

may vindicate his or her statutory cause of action in the arbitral forum,' the statute

serves its functions."  Green Tree Fin. Corp., 531 U.S. at 90 (quoting Gilmer v.

Interstate/Johnson Lane Corp., 500 U.S. 20, 28 (1991).  Plaintiffs contend the

arbitration agreements at issue in this case prevent them from effectively

vindicating their FLSA rights because they are required to equally share the costs

of arbitration and must submit all claims for arbitration within one year of the date

the claim first arises.

### a) Cost-Sharing Provision

The Supreme Court addressed the issue of imposing arbitration costs on

claimants in Green Tree Financial, 531 U.S. at 89-92.  The arbitration agreement in

that case did not mention arbitration costs and fees, leaving open the possibility that the plaintiff could be required to pay half of the "potentially steep arbitration costs." Id. at 83. The Eleventh Circuit refused to enforce the agreement to arbitrate, reasoning that the agreement posed a risk that the plaintiff's "ability to vindicate her statutory rights would be undone by 'steep' arbitration costs." Id. Green Tree Financial did not entirely disagree, noting that "[i]t may well be that the existence of large arbitration costs could preclude a litigant . . . from effectively vindicating her federal statutory rights in the arbitral forum." Id. at 90.

Nevertheless, the Supreme Court held that the Eleventh Circuit erred in refusing to enforce the arbitration agreement. The Court noted that "the record does not show that [the plaintiff] will bear such costs if she goes to arbitration. Indeed, it contains hardly any information on the matter." Id. Ordinarily, however, "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." Id. at 91. The Supreme Court thus concluded that "where . . . a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." Id. at 91-92. Green Tree Financial did not decide how detailed a showing a plaintiff must make to avoid arbitration, because it was clear in that case that the plaintiff did not make

any such showing, despite having undergone discovery and a ruling on the merits. Id. at 92. The plaintiff's naked assertion that she risked being "saddled with prohibitive costs" was "too speculative to justify the invalidation of an arbitration agreement." Id. at 91.

Not long after Green Tree Financial, the Eleventh Circuit considered the enforceability of an arbitration agreement with a cost-shifting provision, under which the losing party was required to pay the other party's attorneys' fees and other expenses. Musnick v. King Motor Co. of Fort Lauderdale, 325 F.3d 1255, 1257 (11th Cir. 2003). Musnick adopted the majority rule among the circuits that the question whether a particular arbitration provision imposes prohibitively high costs is required to considered on a case-by-case basis. Id. at 1259. That is, there is no per se rule accepting or rejecting arbitration provisions that allocate costs between the parties. Rather, the party seeking to avoid arbitration "has the burden of establishing that enforcement of the agreement would preclude him from effectively vindicating his federal statutory right in the arbitral forum," and "[a]bsent such a showing, the agreement may be enforced." Id.

Musnick described the requirement of a party seeking to avoid arbitration based on the cost of arbitration: The party "has an obligation to offer evidence of the amount of fees he is likely to incur, as well as of his inability to pay those

fees." Id. at 1260.  The Musnick plaintiff submitted an affidavit, without supplementary documentation, stating that he feared the potential imposition of attorney's fees against him and that he would be unable to pay the fees if they were imposed.  Id.  The Eleventh Circuit found that the plaintiff's "showing is wholly inadequate to establish that the arbitration would result in prohibitive costs that force him to relinquish his claim."  Id.  Because the plaintiff "adduced no evidence whatsoever" to support his claim, he was required to arbitrate.  Id.

Applying Musnick, the issue of the cost-sharing provisions in this case is straightforward.  To show that the provision would interfere with the vindication of their federal statutory rights, Plaintiffs were required to submit some evidence of the costs that would be involved and Plaintiff's "inability to pay" the arbitration fees.  Plaintiffs failed to offer evidence on either of these issues. They failed to submit any evidence of ability to pay, even though this burden is well-established and even though this information is exclusively within their possession.  Plaintiffs also failed to offer any evidence of the expenses they are likely to incur.  They have cited a few cases that mentioned average arbitration costs in various circumstances, but there is nothing to indicate the costs likely or reasonably estimated to be incurred under the circumstances of this case.  Here there is no need to guess the likely costs or Plaintiffs' ability to pay, because Plaintiffs have

made no showing on this issue. "Absent such a showing [of cost or inability to pay], the agreement may be enforced." <u>Musnick</u>, 325 F.3d 1255, 1259. The potential cost of arbitration is not a basis for refusing to compel arbitration. <u>Id.</u> at 1260 (holding that an order compelling arbitration was appropriate, and additional fact-finding on question of cost not appropriate, where party had opportunity to make a record on the issue and did not); <u>Bess v. Check Express</u>, 294 F.3d 1298, 1309 (11th Cir. 2002) (same).

Although Plaintiffs failed to provide any factual support upon which to meet their burden to show that arbitration costs are prohibitive, the question is not settled definitively. If Plaintiffs actually incur arbitration fees that are excessive in light of their damages or their financial resources, they may seek judicial review of the arbitral award. <u>Musnick</u>, 325 F.3d at 1261. The Court can then determine whether the actual application of the cost-sharing provision inhibited Plaintiffs from remedying purported violations of their federal statutory rights. There is, however, no reason to suspect that cost will be an issue. As <u>Musnick</u> notes, even when arbitration agreements contain mandatory distribution of costs language, arbitrators typically exercise discretion to determine independently whether these contractual limitations are enforceable or should be enforced in a given case. 325 F.3d at 1261 n.7 (collecting cases from First, Third, and Eighth Circuits).

The plaintiff in <u>Anders v. Hometown Mortgage Services, Inc.</u>, for example, unlike Plaintiffs here, submitted an affidavit explaining the plaintiff's inability to pay the costs of arbitration. 346 F.3d 1028, 1028-29 (11th Cir. 2003). The affidavit contained detailed references to plaintiff's assets, debt, income, expenses, and his credit report. <u>Id.</u> This information still was insufficient not to enforce the arbitration provision, because the arbitration agreement in that case provided that the American Arbitration Association ("AAA") Rules for Commercial Financial Disputes governed the arbitration process. The AAA rules dictated that all costs ordinarily would be shared equally, and gave the arbitrator discretion not to assess administrative fees against a party unable to bear them and discretion to otherwise assess costs and expenses against parties as appropriate. <u>Id.</u> The defendant in <u>Anders</u> also stipulated that it would help defray the costs of arbitration. <u>Id.</u> at 1029. The Eleventh Circuit concluded that under the circumstances of that case, plaintiff had not demonstrated that arbitration would be prohibitively expensive for him. <u>Id.</u>[10]

---

[10] While the case here is different from <u>Anders</u> because the arbitration agreements do not explicitly incorporate rules from the American Arbitration Association and Amerisave has not stipulated to waiving the requirement that the parties split the arbitration expenses, the discretion given to arbitrators to waive or assess costs and expenses is typical and widespread enough to infer that the arbitration costs in this case are speculative.

Although the established law is that imposing prohibitive costs on plaintiffs arbitrating under federal statutory rights may be grounds for refusing to order arbitration or for overturning an arbitral award, the Court finds it unlikely that an arbitrator would assess unreasonably high costs against Plaintiffs or that Amerisave would not waive that obligation of the arbitration agreements.  If Plaintiffs ultimately contend that the costs assessed are prohibitively high, Plaintiffs may challenge the arbitral award on that ground.

        b)        One-Year Limitation On Submitting Claims To Arbitration

Plaintiffs next contend that the arbitration agreements prevent them from vindicating their federal statutory rights because the one-year limitations period in the agreements bars them from bringing claims that are otherwise available under the FLSA.  Under the Employment Agreement and Acknowledgment, employees must make a written request to arbitrate any dispute within one year after the dispute arises.  The Employment Agreement provides that employees "must deliver a written request for arbitration to Amerisave within one (1) year from the date of termination, or one (1) year from the date on which the alleged incident(s) or conduct occurred."  Similarly, in the Acknowledgment, employees agree to "submit any dispute . . . arising under or involving [their] employment with Amerisave to binding arbitration within one (1) year from the date the dispute first

arose." The FLSA gives employees two years to assert claims for relief, unless the employer's violation was willful, in which case the limitations period is three years. 29 U.S.C. § 255(a).

Amerisave argues that its arbitration agreements do not impose limitations periods because they only require notice, not claims. This is not a plausible reading of these limitations provisions. The requirement to resolve all disputes related to the employment relationship through arbitration combined with the condition that all requests for arbitration must be delivered within a year unambiguously imposes a time limit on submitting claims for relief. Labeling the provision as a notice rather than a limitations period does not govern the effect or purpose of the provision. After all, the major purpose of statutes of limitations is to provide notice to defendants, Welch v. La. Power & Light Co., 466 F.2d 1344, 1346 (5th Cir. 1972), and that is what the one-year limitations period requires here.

Nearly identical language was construed as a limitations period in Jackson v. Cintas Corp., No. 1:03-cv-3104-JOF, 2004 WL 5545444, at * 6-7 (N.D. Ga. 2004), aff'd, 425 F.3d 1313 (11th Cir. 2005). The agreement in Jackson required employees, "within one year of the date when the dispute or difference first arose," to "submit to Employer a written request to have such claim, dispute or difference resolved through impartial arbitration." Id. The Court in Jackson reasoned that the

notice provision effectively imposed "a shortened arbitration statute of limitations period." Id. at *7; see also Kristian, 446 F.3d at 43; Anderson v. Comcast Corp., 500 F.3d 66, 75 & n.8 (1st Cir. 2007). Construing the terms of the agreements according to their plain meaning, Perkins v. M&M Office Holdings, LLC, 695 S.E.2d 82, 84 (Ga. Ct. App. 2010) ("Unambiguous language must be afforded its literal meaning and plain ordinary words given their usual significance."), the court in Jackson found and the Court here finds that the notice requirement is in the nature of a limitations period.

Amerisave next argues that the agreements here do not impose a limitations period on overtime claims. Both the Employment Agreement and the Acknowledgment state that arbitration is the exclusive remedy for resolving disputes and that arbitration is only available if the employee delivers a written request for arbitration within a year of the dispute arising. This plainly and unambiguously operates as a limitations period for all disputes arising out of the employment relationship. Amerisave argues further that because the Agreement contains additional language stating that the employee will have waived all claims related to discrimination, harassment, or the employee's termination if the employee fails to request arbitration within one year, the provision does not apply to non-termination and non-discrimination claims like the FLSA claims at issue in

this case.  Amerisave thus reasons that FLSA claims are not waived if notice of them is not given within the one-year notice period.

A plain reading of the Employment Agreement does not support this interpretation.  Georgia law requires that contracts be examined and interpreted as a whole.  See Capital Color Printing v. Ahern, 661 S.E.2d 578, 583 (2008). Reading the Agreement in its entirety requires the conclusion that the failure to request arbitration within a year of when a claim arises precludes assertion of the claim.  The language suggesting that discrimination and termination claims are waived is intended to make clear that these specific claims are waived if notice of them is not given a year.  It would be nonsensical to suggest that it overwrites the requirement in the same paragraph to subject all claims to arbitration.

Having decided that the Employment Agreement and Acknowledgment impose a one-year limitations period on overtime claims, the question remains whether that limitations period may be enforced consistently with federal law. Arbitration, of course, "rests on the assumption that the arbitration clause permits relief equivalent to court remedies."  Paladino v. Avnet Computer Techs., Inc., 134 F.3d 1054, 1062 (11th Cir. 1998).  A shortened limitations period may cause arbitration to offer less relief than a judicial proceeding.  In Jackson v. Cintas Corp., 425 F.3d 1313, 1317 (11th Cir. 2005), the Eleventh Circuit stated that it was

"undisputed that the arbitration clause contained an illegal provision that purported to limit the time in which [the plaintiff] could bring claims against [the defendant]." The district court in <u>Jackson</u> observed that, as a practical matter, a shortened statutory limitations period "could be read as preventing [the plaintiff] from raising particular statutory claims at all. If [the plaintiff] is precluded from raising otherwise valid statutory claims by a shortened arbitration statute of limitations period, [the plaintiff] is precluded from receiving any meaningful relief on those claims." 2004 WL 5545444, at *7; <u>see also</u> <u>Graham Oil Co. v. ARCO Prods. Co.</u>, 43 F.3d 1244, 1247-48 (holding that limitations period in arbitration agreement that reduced one-year statutory limitations period to 90 days was unenforceable).

This reasoning is persuasive. If a plaintiff allegedly was not paid for overtime hours worked in the first half of 2010 and joined this lawsuit in June 2011, that plaintiff would have a claim for relief under federal law but would not be able to obtain relief under the arbitration agreement. In that instance, the plaintiff's relief under the arbitration agreements and federal law would be *de facto* not equivalent. The Court concludes that the limitations period is unenforceable

because it would operate to preclude Plaintiffs from enforcing statutory claims through arbitration that they would otherwise be permitted to assert in court.[11]

        c)      Severability

Because the arbitration agreements contain unenforceable limitations provisions, the enforceability of the remaining provisions of the arbitration agreement depends on whether the offending provision is severable. Severability is a question of state law. Georgia law provides:

> (a) A contract may be either entire or severable. In an entire contract, the whole contract stands or falls together. In a severable contract, the failure of a distinct part does not void the remainder.
>
> (b) The character of the contract in such case is determined by the intention of the parties.

Ga. Code Ann. § 13-1-8(a). "The parties' intent may be expressed directly, through a severability clause, or indirectly, as when the contract contains promises to do several things based upon multiple considerations." Vegesina v. Allied Informatics, Inc., 572 S.E.2d 51, 53 (Ga. Ct. App. 2002) (internal quotation marks omitted).[12]

---

[11] This issue must be addressed by the Court in the first instance because at least some plaintiffs appear to have claims going back several years. (See Compton Decl. [17-2] ¶ 2 (noting that Plaintiff Wayman was employed by Amerisave from 2007 to 2011)).

[12] Amerisave argues that Rent-A-Center, West, Inc. v. Jackson, 130 S. Ct. 2772 (2010), held that unenforceable provisions in arbitration agreements are severable

The parties agree that the agreements here do not contain severability

clauses. The question of severability therefore depends on the indirectly expressed

intentions of the parties, as demonstrated by the structure of the arbitration

agreements. "In determining whether the contract is entire or severable, the

criterion is to be found in the question whether the whole quantity, service or

thing—all as a whole—is of the essence of the contract." Nolley v. Maryland Cas.

Ins. Co., 476 S.E.2d 622, 626 (Ga. Ct. App. 1996) (quoting Burns v. Mitchell, 191

S.E. 870 (Ga. 1937)).[13]

---

as a matter of federal law. Amerisave misunderstands Jackson's holding and its
reliance on that case is misplaced. Jackson applied the established rule that an
arbitration provision in a contract is, as a matter of substantive federal law,
severable from the contract in which it is found. There were two arbitration
agreements at issue in Jackson: a standard agreement to arbitrate employment
disputes between the parties, and a second agreement to arbitrate disputes over the
enforceability of the first arbitration agreement. The plaintiff had challenged the
underlying arbitration agreement as unconscionable (incidentally, because, like
here, it contained a fee-sharing provision). Jackson held that because arbitration
agreements are severable, the second arbitration agreement could not be
undermined by attacks on the enforceability of the underlying arbitration
agreement, and thus the agreement to arbitrate disputes over arbitrability was
required to be enforced. Jackson is not relevant here where there is a single
arbitration agreement.

[13] The Court does not discern any meaningful differences in the laws of the other
states to which Plaintiff argues the legal agreements are subject. As in Georgia,
the question comes down to the proper construction of the contract based on the
intention of the parties and whether the promises are interdependent. See, e.g.,
Demattia v. Mauro, 860 A.2d 262, 269 (Conn. Ct. App. 2004); J.R.D. Mgmt. Corp.
v. Dulin, 883 So.2d 314, 316-17 (Fla. Ct. App. 2004); Jackson Motor Speedway,
Inc. v. Ford, 914 So.2d 779, 784 (Miss. Ct. App. 2005) (citing Mariana v.

"A contract based on legal and binding consideration and containing an attempted waiver of a right which cannot be waived because contrary to public policy, which waiver is wholly incidental to the purposes of the contract, is severable, and the part which is legal is nevertheless enforceable." Id. (quoting Adams v. Trust Co. Bank, 426 S.E.2d 36 (1992)).

> The rule is that where an agreement consists of a single promise, based on a single consideration, if either is illegal, the whole contract is void. But where the agreement is founded on a legal consideration containing a promise to do several things or to refrain from doing several things, and only some of the promises are illegal, the promises which are not illegal will be held to be valid.

Vegesina v. Allied Informatics, Inc., 572 S.E.2d 51, 53 (Ga. Ct. App. 2002) (quoting O.H. Carter Co. v. Buckner, 287 S.E.2d 636, 638 (1981)).

The structure of the arbitration agreements supports that the parties intended for the one-year limitations provisions to be severable from the remainders of the

---

Hennington, 90 So.2d 356 (Miss. 1956)); Kornegay v. Aspen Asset Group, LLC, 693 S.E.2d 723 (N.C. Ct. App. 2010); Care Med. Equip., Inc. v. Baldwin, 15 P.3d 561, 563-64 (Or. 2000); Vega v. Chattan Assocs., Inc., 435 S.E.2d 142, 143 (Va. 1993). Because Plaintiff has the burden of proving a matter is not required to be arbitrated and has failed to indicate any state law which holds that the agreements here are not severable, and because the Court likewise has not located any relevant state laws in conflict with Georgia law, the Court concludes it is appropriate to assume that all of the agreements are subject to essentially the same severability analysis as required by Georgia law.

arbitration agreements.[14]  The one-year limitations period is not integral or essential to the arbitration agreements.  The limitations period is most reasonably characterized an ancillary, administrative, or procedural aspect of the arbitration to which the parties agreed, but which is not essential to the core terms of the agreement.  Cf. Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84-85 (2002) (application of time-limits provision of arbitration agreement was procedural question, not substantive).  The structure of the promises and consideration shows that the parties made a central agreement to arbitrate their employment disputes, adding a processing term to require notice of arbitration disputes within a year.

Because the arbitration agreements contain a central promise, favored by federal law, to arbitrate their employment agreement, and an ancillary agreement to initiate arbitration claims within a year, the Court infers from the nature and structure of the agreement that the parties intended for the promises to be separate. The agreement to arbitrate is severable from the agreement to initiate arbitration within a year, and on this basis the agreements between the parties to arbitrate this

---

[14] Plaintiffs argue that, as a policy matter, courts should not sever unenforceable provisions in arbitration agreements, citing Perez v. Glob Airport Sec. Servs., 253 F.3d 1280, 1287 (11th Cir. 2001), vacated, 294 F.3d 1275 (11th Cir. 2001). Although Plaintiffs concede that Perez was vacated, the Eleventh Circuit has twice instructed parties in circumstances like those here that Perez should not be relied upon at all.  Musnick, 325 F.3d at 1257 n.1; Anders, 346 F.3d at 1030 n.5.

dispute must be enforced unless there is an independent state law basis for refusing to enforce this contract.

### 2. *Enforceability Under State Law*

Plaintiffs suggest the arbitration agreements may be unenforceable under various state law doctrines of unconscionability. Under Georgia law, the unconscionability determination is divided into procedural and substantive elements. Jenkins v. First Am. Cash Advance of Ga., LLC, 400 F.3d 868, 875 (11th Cir. 2005). "Procedural unconscionability addresses the process of making the contract, while substantive unconscionability looks to the contractual terms themselves." Id. (quoting NEC Techs., Inc. v. Nelson, 478 S.E.2d 769, 771-72 (Ga. 1996)). "Factors relevant to the procedural unconscionability inquiry include the bargaining power of the parties, 'the conspicuousness and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of a meaningful choice.'" Id. at 875-76 (quoting Nelson, 478 S.E.2d at 771).

Under Section 4 of the FAA, a court must enforce an arbitration agreement "once it is satisfied that 'the making of the agreement for arbitration . . . is not in issue.'" Id. (quoting 9 U.S.C. § 4). The Supreme Court has interpreted this language to mean that the party seeking to avoid arbitration must demonstrate that the arbitration agreement is invalid on grounds that apply specifically to the

arbitration agreement and not on grounds that apply generally to the entire contract in which an arbitration provision is found. Id. (citing Prima Paint Corp. v. Flood & & Conklin Mfg. Co., 388 U.S. 395, 403-04 (1967)). For example, a party seeking to avoid arbitration by arguing fraud in the inducement must argue that it was fraudulently induced to agree to the arbitration provision specifically, because only that argument would attack the "making" of the agreement to arbitrate under Section 4 of the FAA. Id. at 867-77 (citing Prima Paint Corp., 388 U.S. at 403-04). An argument that the contract as a whole was fraudulently induced is not an attack on the making of the arbitration agreement and thus cannot serve as a basis for refusing to compel arbitration. Id. at 877; see also Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 444 (2006) (district may entertain challenge specifically to the validity of the agreement to arbitrate, but not challenges to the contract as a whole).

a. *Procedural Unconscionability*

Our Circuit has applied this reasoning to procedural unconscionability arguments. Id. at 877. "[I]f the party's claims of adhesion, unconscionability, and lack of mutuality of obligation pertain to the contract as a whole, and not to the arbitration provision alone, then these issues should be resolved in arbitration." Id. (internal quotation marks omitted); see also Madol v. Dan Nelson Auto. Grp., 372

F.3d 997, 1000 (8th Cir. 2004) ("The law required that the plaintiffs' claims be referred to arbitration because their arguments of unconscionability cannot fairly be limited to the making of the arbitration clause." (quotation marks omitted)); Rojas v. TK Commc'ns, Inc., 87 F.3d 745, 749 (5th Cir. 1996) ("claim that the employment agreement is an unconscionable contract of adhesion is an attack on the formation of the contract generally, not an attack on the arbitration clause itself"). But see Nagrampa v. MailCoups, Inc., 469 F.3d 1257, 1274-75 (9th Cir. 2006) (disagreeing with Eleventh Circuit's approach in Jenkins).

In this case, the arbitration provisions in both the Employment Agreement and Acknowledgment were one of several conditions of employment that employees were required to accept. To the extent Plaintiffs would seek to avoid these arbitration agreements as procedurally unconscionable, it would be based on arguments that apply to the terms and conditions as a whole, as expressed either in the employment agreements or the employee manuals. Plaintiffs have not argued any procedural improprieties that apply to the arbitration provisions specifically. Arguments regarding general unconscionability are required to be addressed to the arbitrator.

*b.      Substantive Unconscionability*

In considering a claim of substantive unconscionability, "courts consider 'the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns.'"  Id. at 876 (quoting Nelson, 478 S.E.2d at 772).  Federal courts, not arbitrators, resolve concerns of substantive unconscionability, id. at 877, because arguments that the substance of an arbitration provision is unconscionable are directed at the "making" of the agreement to arbitrate.  Id. (citing 9 U.S.C. § 4).

Whether an arbitration agreement is substantively unconscionable is evaluated similarly to whether arbitration would interfere with the vindication of federal statutory rights.  See Kristian v. Comcast Corp., 446 F.3d 25, 60 n.22 (1st Cir. 2006).  The court in Kristian, for example, noted that although the state unconscionability analysis is broader, it always includes within it concerns that the agreement would frustrate the vindication of statutory rights.  Id.  Courts analyzing arguments about vindicating federal rights often rely upon opinions about state-law substantive unconscionability in their federal-rights analysis.  Id.  Here Plaintiffs have not advanced any argument based on unconscionability and thus unconscionability arguments are deemed waived.  Even if Plaintiff argued the arbitration clause was substantively unconscionable, it is foreclosed by the Court's

previous finding that the arbitration agreements in this case do not prevent

Plaintiffs from vindicating their federal statutory rights.

Under Georgia law, a substantively unconscionable contract is "'such an

agreement as no sane man not acting under a delusion would make and that no

honest man would take advantage of.'" Caley, 428 F.3d at 1378 (quoting Hall v.

Fruehauf Corp., 346 S.E.2d 582, 583 (1986)). The arbitration agreement in Caley

only applied to claims likely to be brought by employees rather than to claims

likely to be brought by the employer, precluded the use of class actions, limited

discovery, required confidentiality, imposed additional procedural steps that

applied to employees but not the employer, limited the employees' access to

counsel at the initial stages of the process, and imposed 30-day deadlines on

employees but not on the employer. Id. at 1378-79. The Court in Caley held that

the arbitration agreement was not unconscionable under Georgia law. The

limitation of the arbitration provisions to claims likely to be brought by employees

did not make the arbitration provision unconscionable because the claims subject

to arbitration were required to be arbitrated by both parties. Even if the

requirement to arbitrate had only bound employees, the Caley court noted that

"Georgia law provides that 'an arbitration provision is not unconscionable because

it lacks mutuality of remedy."  <u>Id.</u> at 1378(quoting <u>Saturna v. Bickley Constr. Co.</u>, 555 S.E.2d 825, 827 (2001)).[15]

Employees agreed in the Acknowledgment that "arbitration shall be the exclusive forum for resolving all disputes arising out of or involving my employment with Amerisave."  In the Employment Agreement, employees agreed that "all disputes between Employee and AMC shall be settled by Arbitration." This broad language, unlike the provision in <u>Caley</u>, does not limit application of the arbitration provision to claims likely to be brought by employees.  Rather, it binds both Plaintiffs and Amerisave to mutual obligations to arbitrate all disputes arising out of their employment relationship.  The agreements do not contain procedural limitations that would disadvantage employees.  The Court in <u>Caley</u> noted specifically that the requirement to share the costs of arbitration does not render the arbitration agreements unenforceable because sharing the costs of

---

[15] Other limitations, like prohibitions on bringing class-wide claims, also did not cause the agreement to be unconscionable.  Although class-wide adjudication is a means of making many low-value claims attractive to litigate, the procedural restrictions of arbitration proceedings allow it to offer "simplicity, informality, and expedition, which also make arbitration an attractive vehicle for the resolution of low-value claims.  <u>Id.</u>

arbitrating claims often is a reasonable way to efficiently and fairly settle disputes between parties.[16]

The Court concludes that the arbitration agreements are not substantively unconscionable under Georgia law.[17]

### 3. Class Allegations

The parties next dispute whether the claims required to be arbitrated must be arbitrated individually or collectively. The preliminary question is whether the Court or an arbitrator should determine whether the arbitration agreements authorize class-wide arbitration.

"'[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" Howsam

---

[16] To the extent that cost-sharing unreasonably disadvantages an employee in specific circumstances, the Court has previously found that Plaintiffs have failed to submit any evidence whatsoever that it would operate in that manner in this case. The question whether the provision is oppressive must therefore be addressed first to the arbitrator, who has discretion to reallocate costs, and second to this Court, if review of the arbitrator's award is requested.

[17] Plaintiffs have not put forth any arguments that any Employment Agreement or Acknowledgment is subject to the law of a state other than, or different from, Georgia law. As noted previously, the Court deems those arguments abandoned and waived. The Court holds that those claims brought by opt-in Plaintiffs who are or were employed by Amerisave in other states are also required to be arbitrated. If an additional former or current Amerisave employee is subject to one of the arbitration agreements and seeks to opt into this litigation from a state different from that of any current Plaintiffs, that potential Plaintiff may file a motion, supported by adequate authority, demonstrating why the arbitration agreements would be unenforceable under the applicable state's law.

v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002) (quoting Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582 (1960)). "The question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the '*question of arbitrability*,' is 'an issue for judicial determination unless the parties clearly and unmistakably provide otherwise.'" Id. (quoting AT&T Techs., Inc. v. Commc'ns Workers, 475 U.S. 643, 649 (1986); First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995)). This is distinct from "'procedural' questions which grow out of the dispute and bear on its final disposition," which "are presumptively not for the judge, but for an arbitrator." Id. at 84.

The parties contest whether class-action arbitration is a substantive question of arbitrability, or a procedural aspect of arbitration. Plaintiffs contend that Green Tree Fin. Corp. v. Bazzle, 539 U.S. 453 (2003) requires the arbitrator to answer the question whether an arbitration agreement authorizes class-wide arbitration. Amerisave contends that Bazzle, only a plurality opinion, is not controlling and that Stolt-Nielsen S.A. v. Animalfeeds Int'l Corp., 130 S. Ct. 1758 (2010) requires the Court to strike Plaintiffs' class allegations.

Bazzle involved a loan contract with an arbitration clause requiring that "[a]ll disputes, claims or controversies arising from or relating to this contract or the relationships which result from this contract shall be resolved by binding

arbitration by one arbitrator selected by us with consent of you." 539 U.S. at 448.
The parties disputed whether this language prohibited class-wide arbitration. Id.
The plurality opinion found that the contractual language failed to clearly resolve
the class-wide arbitration issue. Id. at 450-51. The plurality concluded that the
dispute over whether class-wide arbitration was allowed constituted a procedural
question, and was not the typical gateway inquiry into arbitrability that parties
expect courts to decide. Id. at 452. The question was not whether they agreed to
arbitrate the dispute in question, only "what kind of arbitration the parties agreed
to." Id. (emphasis removed). The plurality remanded the case to allow the
arbitrator to decide if the agreement contemplated or required class wide
arbitration.

Justice Stevens, writing alone, concurred in part and dissented in part. Id. at
454-55. He did not adopt the plurality's rationale, stating only that "[a]rguably the
interpretation of the parties' agreement should have been made in the first instance
by the arbitrator, rather than the court." Id. at 454. He believed that the agreement
authorized class-wide arbitration. Id. at 455. While Justice Stevens did not see the
need to remand the case, he joined in the plurality decision so there would be a
controlling judgment in the case. Id.

As <u>Stolt-Nielsen</u> noted, "<u>Bazzle</u> did not yield a majority decision" on the issue of "which decision maker (court or arbitrator) should decide whether the contracts in question were 'silent' on the issue of class arbitration." 130 S. Ct. at 1771-72. The Court in <u>Stolt-Nielsen</u> also did not decide the question, the parties in that case having stipulated that they had not reached an agreement on the question of class-wide arbitration, agreeing instead to have their arbitration panel decide whether the dispute should be arbitrated class-wide. <u>Id.</u> The issue in <u>Stolt-Nielsen</u> was only "the standard to be applied by a decision maker in determining whether a contract may permissibly be interpreted to allow class arbitration." <u>Id.</u> <u>Stolt-Nielsen</u> held that where a contract is silent as to class arbitration, class arbitration may not be imposed on a party.

The decisions in <u>Bazzle</u> and <u>Stolt-Nielsen</u> are not conflicting. <u>Bazzle</u> applies the well-established rule that courts decide gateway questions of arbitrability, but not questions of arbitration procedure. Where it is ambiguous whether an agreement authorizes class arbitration, <u>Bazzle</u> concludes the question is a procedural one to be answered by the arbitrator. <u>Stolt-Nielsen</u> holds that unless the parties agreed to class arbitration in the arbitration agreement, the arbitrator may not impose it. In other words, <u>Bazzle</u> requires the arbitrator to determine if an arbitration provision provides for class arbitration. <u>Stolt-Nielsen</u> provides that

class arbitration is allowed only where the parties actually agreed to authorize arbitration on a class basis. See, e.g., Vilches v. Travelers Cos., 413 F. App'x 487, 492 & n.3 (3d Cir. 2011) (reading Bazzle to require that question of class arbitration be submitted to arbitrator, even though under Stolt-Nielsen it was unlikely that the arbitration agreement could be interpreted to authorize class arbitration).

The cases cited by Amerisave do not discredit these two principles. Two of the cited cases involve specific class-action waivers. See Slawienski v. Nephron Pharm. Corp., No. 1:10-cv-460-JEC, 2010 WL 5186622, at *2 (N.D. Ga. Dec. 9, 2010); Zekri v. Macy's Retail Holdings, Inc., No. 1:10-cv-1740-MHS, 2010 WL 4660013, at *1 (N.D. Ga. Nov. 4, 2010). In the third case, the magistrate judge distinguished Bazzle and held it was appropriate to consider the question of class arbitration because both parties requested the court to resolve the class-action question when is resolved the principal disagreement between the parties over whether the arbitration agreement was enforceable. Chen-Oster v. Goldman, Sachs & Co., 785 F. Supp. 2d 394, 400 (S.D.N.Y. 2011). That situation is not present in this case.

In summary, the Court grants Amerisave's motion to compel the named plaintiff and opt-in plaintiffs, who signed the Employment Agreement or

Acknowledgment (the "Arbitrating Plaintiffs"), to arbitrate their claims against Amerisave, and this action is stayed with respect to the Arbitrating Plaintiffs. The Court denies Amerisave's motion to strike the class allegations and compel arbitration on an individual basis. The parties are required to submit that issue to the arbitrator.[18] For those Plaintiffs who did not agree to arbitrate their claims, the motion to stay this action is denied.

B.    <u>Motion To Conditionally Certify Collective Action</u>

Plaintiffs move to conditionally certify a collective action pursuant to the FLSA, 28 U.S.C. § 216(b), on behalf of themselves and other SMPs who allegedly worked for Amerisave without receiving overtime pay in the last three years. In light of the Court's holdings above, the Court considers the motion to conditionally certify with respect to only the non-Arbitrating Plaintiffs.

*1.    Legal Standard*

The FLSA requires covered employers to pay non-exempt employees who work more than forty hours in a week an overtime rate of one and one-half times

---

[18] This is a formality in this case, as a finding that the parties in this case agreed to class arbitration would flatly contradict the reasoning of <u>Stolt-Nielsen</u>. Plaintiffs' argument that <u>Stolt-Nielsen</u>'s reasoning distinguishes between class actions and collective actions is unpersuasive. <u>Stolt-Nielsen</u>'s holding depended on the significant differences between class and individual arbitration, and that holding applies with equal force to "collective arbitration" under the FLSA, as there is no meaningful distinction between collective and class arbitration.

the employee's regular pay rate for all hours worked that exceed forty.  Id. §

207(a).  Section 216(b) imposes liability on employers for violations of Section

207 and authorizes employees to bring lawsuits to recover that liability.

Employees may sue individually or they may bring a collective action on behalf of

themselves and other "similarly situated" employees:

> An action . . . may be maintained against any employer (including a
> public agency) in any Federal or State court of competent jurisdiction
> by any one or more employees for and in behalf of himself or
> themselves and other employees similarly situated. No employee shall
> be a party plaintiff to any such action unless he gives his consent in
> writing to become such a party and such consent is filed in the court in
> which such action is brought.

Id. § 216(b).  In contrast to a class action under Federal Rule of Civil Procedure 23,

which generally requires potential plaintiffs to opt-out if they do not wish to be

represented in the lawsuit, a collective action under Section 216(b) requires

potential plaintiffs to affirmatively opt into the lawsuit.  Hipp v. Liberty Nat'l Life

Ins. Co., 252 F.3d 1208, 1216 (11th Cir. 2001).[19]  "The decision to create an opt-in

class under § 216(b) . . . remains soundly within the discretion of the district

court."  Id. at 1219.

---

[19] Hipp involved a collective action under the Age Discrimination and
Employment Act of 1967, but that statute incorporates the FLSA's collective
action provision, and Hipp therefore applies in both contexts.  Morgan v. Family
Dollar Stores, Inc., 551 F.3d 1233, 1259 n.37 (11th Cir. 2008).

The Eleventh Circuit encourages district courts to perform a two-step process to certify a collective action under Section 216(b).  Id.  In the initial, so-called "notice stage," the question is whether notice of the action should be given to potential class members.  Id. at 1218 (quoting Mooney v. Aramco Servs. Co., 54 F.3d 1207, 1213 (5th Cir. 1995)).  Relying on the pleadings and affidavits submitted by the parties, the court applies a "fairly lenient standard" that "typically results in 'conditional certification' of a representative class.  Id. (quoting Mooney, 54 F.3d at 1213-14).  After conditional certification, potential class members receive notice and an opportunity to opt into the class and the parties complete discovery.  Id. (quoting Mooney, 54 F.3d at 1213-14).

The second stage is optional and usually occurs if the defendant moves for "decertification" after the completion of all or most discovery in the case.  Id. (quoting Mooney, 54 F.3d at 1213-14).  Based on the more extensive factual record, the court makes a factual determination whether claimants are similarly situated.  Id. (quoting Mooney, 54 F.3d at 1213-14).  If they are, the collective action proceeds on the merits.  If not, the court decertifies the class, the opt-in plaintiffs are dismissed without prejudice, and the original plaintiffs proceed on their individual claims.  Id. (quoting Mooney, 54 F.3d at 1213-14).

There is nothing in this case that indicates the Court should not follow the two-stage approach encouraged by the Eleventh Circuit.[20] The notice-stage analysis focuses on whether there are other employees who would desire to opt-in, and who are "similarly situated" to plaintiffs. See Dyback v. State of Fla. Dep't of Corr., 942 F.2d 1562, 1567-68 (11th Cir. 1991). The Plaintiffs who already have requested to opt-in show that some former employees desire to be members of a collection action, and the Plaintiffs' declarations reasonably suggest that additional claimants might opt-in if they received notice. The desire to opt-in criteria is met and the Court turns to the similarly situated criteria.

Plaintiffs bear the burden of demonstrating a reasonable basis to conclude that they are similarly situated to the members of the proposed collective action. Cf. Grayson v. K Mart Corp., 79 F.3d 1086, 1097 (11th Cir. 1996). "The plaintiffs may meet this burden, which is not heavy, by making substantial allegations of class-wide discrimination, that is, detailed allegations supported by affidavits which successfully engage defendants' affidavits to the contrary." Id. Plaintiffs

---

[20] In some cases where there is factual information available to evaluate the similarity of potential class member claims courts will combine the first and second stages and apply the more stringent second stage standard. See, e.g., Williams v. Accredited Home Lenders, Inc., No. 1:05-cv-1681-TWT, 2006 WL 2085312, at *4 (N.D. Ga. July 25, 2006) (combining first and second stage where plaintiffs disseminated informal notice to potential opt-in plaintiffs and substantial discovery had been completed). The facts are not yet sufficiently developed in this matter to justify a higher standard.

are required only to show that they and the potential class-members are similarly, not identically, situated. Id. at 1096. They are not required to show they were subjected to a common or unified policy, plan, or scheme, see id. at 1095, although this is a common and effective way to satisfy the "similarly situated" requirement. Plaintiffs "must [at least] make some rudimentary showing of commonality between the basis for [their] claims and that of the potential claims of the proposed class, beyond the mere facts of job duties and pay provisions." Scott v. Heartland Home Fin., Inc., No. 1:05-cv-2812-TWT, slip op. at *6 (N.D. Ga. May 3, 2006) (quoting Marsh v. Butler Cnty. Sch. Sys., 242 F. Supp. 2d 1086, 1093 (M.D. Ala. 2003)); see also Barron v. Henry Cnty. Sch. Sys., 242 F.Supp.2d 1096, 1103 (M.D. Ala.2003) ("[W]hile a unified policy, plan, or scheme of discrimination may not be required to satisfy the more liberal similarly situated requirement, some identifiable facts or legal nexus must bind the claims so that hearing the cases together promotes judicial efficiency.").

### 2. Application

Plaintiffs rely on the declarations of 15 named and opt-in Plaintiffs to show that the current and potential claimants are similarly situated. Four of the declarations are submitted on identical forms that the declarants signed in June 2011 (the "June Declarations" [21-3 to -6]). The remaining 11 declarations also

46

are identical, and were signed by the declarants in July 2011 (the "July Declarations" [21-7 to -17]).

Only two of the four June Declarations state that the declarants worked more than 40 hours with the knowledge or encouragement of management. Those declarations state: "I was told by management that after I logged 40 hours per week in the online time tracking system that I should log back into the system and erase previous time records in order to work more than 40 hours in a week." (Decls. of Scott Blattman and Anthony McCallahan, ¶¶ 9). In those two declarations and one other of the declarations, the declarants state they "commonly worked substantially more than 40 hours in a workweek," that "Management encouraged Senior Mortgage Processors to work long hours," that "Management would also make it clear that we were expected to work as many hours as necessary to close loans," and that they were "never paid the overtime differential on [their] commissions for the hours [they] worked over forty in a workweek." (Decl. of Anthony Wong ¶¶ 5, 9-11; Decl. of Blattman ¶¶ 5, 10-12; Decl. of McCallahan ¶¶ 5, 10-12). The fourth June declarant states that he worked more than 40 hours and was not paid overtime, but never states that management knew about or encouraged the overtime. (Decl. of Thomas DeMaria). In none of the four June Declarations do the declarants state when they worked for Amerisave, to

which manager they reported, or which undisclosed member of "management"

encouraged them to work "long hours" or to work more than 40 hours a week.

All eleven of the July Declarations are identical, and assert:

12. I was locked out of the time keeping system when I exceed forty
hours. At that time, I was able to back out my time and continue
working.

13. I worked more than forty hours per week and I was not paid the
overtime differential on my hours over 40.

14. If I was not able to meet certain goals, I was subject to termination.

15. My manager informed me that he was able to see my activity hours in
the system.

(See generally, July Declarations, ¶¶ 12-15). As with the June Declarations, there

is no indication to which managers these SMPs reported. Since they state that their

manager told them the same things, it is unclear whether they worked for the same

individual. Unlike the June Declarations, the affiants in the July Declarations

admit to falsifying their time sheets to underreport their hours worked, and they

suggest that their manager knew about it because he was able to see their "activity

hours in the system." (July Declarations, ¶¶ 12, 15).

The vagueness and superficiality of Plaintiffs' declarations make it difficult

to evaluate the exact nature of Plaintiffs' similarity argument. The declarations

essentially support that 15 former SMPs, who worked for unnamed and possibly

different managers, worked more than 40 hours week. One of these SMPs was not told by Amerisave to not report his overtime hours and this declarant does not have any reason to believe that Amerisave had actual or constructive knowledge that he was underreporting his hours. (Decl. of DeMaria). Two SMPs, Blattman and McCallahan, explicitly state that they were told by unnamed management members to falsify their timesheets. The remaining 12 SMPs advance the theory that they routinely worked more than 40 hours per week, that management could tell when they were working more than 40 hours, and that they were pressured to work off-the-clock because if they did not meet certain production goals they would be terminated.

Plaintiffs rely on two cases to support their request for the Court to conditionally certify these "off-the-clock" overtime collective actions. The cases cited by Plaintiffs are dissimilar to the case here. In <u>Dietrich v. Liberty Square, LLC</u>, 230 F.R.D. 574, 577 (N.D. Iowa 2005), the Court conditionally certified a class based, in part, on allegations of unpaid overtime. That case, however, involved allegations of specific policies that allegedly operated to deprive the plaintiffs of overtime compensation in a systematic manner, such as misclassifying employees as exempt under the FLSA, refusing to award overtime if employees worked greater than forty hours split between different work sites, or requiring

additional duties to be performed after the employee clocked out.  These were specific policies allegedly adopted by the employer that applied to all affected employees.  The plaintiffs in that case also provided detailed affidavits describing the impact of the disputed policies on them.

Similarly, in Clarke v. Convergys Cust. Mgmt. Grp., Inc., 370 F. Supp. 2d 601, 606 (S.D. Tex. 2005), the court conditionally certified a class based on "off the clock" claims.  The defendant in that case operated 35 call centers across the United States, although the proposed class was specific and localized.  It was brought on behalf of employees who worked on one floor of a multi-floor facility. Id. at 603, 606.  Importantly, the Plaintiffs made "detailed allegations regarding the allegedly unlawful policies at issue," which involved a specific policy of only paying employees for the time they were logged into the time keeping system, despite having identifiable and common tasks they were required to perform before and after logging onto the system.  Id.  This practice, the Court found, affected all the proposed class members in the same manner and justified proceeding collectively.  Id. at 606.

This case is significantly different from Dietrich and Clarke.  Unlike the specific and detailed allegations in those cases, the allegations and declarations here are vague and superficial.  Dietrich and Clarke involved concrete allegations

that specific employment practices caused employees to work overtime for which they were not compensated, while the allegations in this case involve whether the pressures of meeting performance expectations and the innuendo of statements by unnamed management figures created an environment where various SMPs felt pressured to falsify their timesheets. Regardless of whether the SMPs are similarly situated, there is no specific employment plan or condition being challenged in this case that would bring it within the reasoning of Dietrich and Clarke.

On the other hand, Amerisave overstates that courts nearly always refuse to conditionally certify classes in off-the-clock overtime cases. Horne v. United Servs. Auto. Ass'n, 279 F. Supp. 2d 1231 (M.D. Ala. 2003), a case relied on by Amerisave, is in fact similar to the case here because it involves allegations that production goals induced employees to work more than forty hours a week without reporting overtime hours. The court in Horne, however, denied conditional certification because the single plaintiff relied entirely on his own allegations that his manager induced him to work unreported overtime. Id. at 1235. The illegal overtime theory on which this claim was based was specific to his manager, and it was not clear whether there were other potential claimants who were required to work unreported overtime by other, different managers. Id. at 1235-36. It was even unclear whether that plaintiff's manager had similarly required others he

supervised to work overtime illegally.  Id.  The court concluded that other

evidence, such as consents to join the suit, could have been presented to show

some possibility that there were similarly situated claimants, but other evidence

was not offered.  Id. at 1237.  By contrast, this case currently involves 30

Plaintiffs, including opt-ins, and 15 declarations.  While the declarations are

cursory, Plaintiffs have presented evidence to support that the alleged wrongful

conduct extended beyond the circumstances of a single plaintiff or even a handful

of plaintiffs.  See also Salinas v. O'Reilly Auto., Inc., No. 3:04-cv-1861, 2005 WL

3783598, at *5 (N.D. Tex. Nov. 17, 2005) (where declarant worked at six of

defendant's stores for different managers and only complained of one particular

manager's conduct during a four month period, evidence was not sufficient to

support a collective action).

Two fundamental issues drive this case.  The first is whether a given

particular employee worked overtime—an individual issue.  The second is whether

Amerisave knew or had a duty to know about alleged unreported overtime hours,

see Elliott v. United States, 28 F.3d 1076, 1081-82 (11th Cir. 1994)—an issue that

arguably applies to all SMP's.  Several of the declarations submitted by the

Plaintiffs support Plaintiffs' litigation theory that Amerisave incentivized

unreported overtime by demanding work output that typically could not be

accomplished in a forty hour workweek, yet prohibiting an employee from reporting overtime hours worked.  See Allen v. Bd. of Pub. Educ. for Bibb Cnty., 495 F.3d 1306, 1319 (11th Cir. 2007) ("when an employer's actions squelch truthful reports of overtime worked, or where the employer encourages artificially low reporting, it cannot disclaim knowledge").

Some courts have conditionally certified off-the-clock overtime cases where plaintiffs allege that aggressive production goals created unwritten policies of working unreported overtime, even where employers had a written policy against working off the clock.  See, e.g., Burkhart-Deal v. Citifinancial, Inc., No. 07-1747, 2010 WL 457127, at *3 (W.D. Pa. Feb. 4, 2010) (conditionally certifying off-the-clock overtime case based on "unwritten policy or practice resulting in unpaid overtime, such as hinging management pay on meeting hours targets," because issue of whether claims would depend on individualized circumstances was better addressed at second-stage decertification process); Falcon v. Starbucks Corp., 580 F. Supp. 2d 528, 536 (S.D. Tex. 2008) (refusing to decertify collective action involving off-the-clock overtime claims, despite official company policy disallowing working unreported hours and even though plaintiffs worked in different stores supervised by different managers, because plaintiffs had same job

title and duties and were subject to common unwritten policy of assigning more work than could be completed in 40 hours while discouraging working overtime).

Another court found similar allegations to be insufficient to support conditional collective action certification. See, e.g., Simmons v. T-Mobile USA, Inc., No. H-06-1820, 2007 WL 210008, at *6-7 (S.D. Tex. Jan. 24, 2007) (refusing to conditionally certify class based the plaintiff's "overly general statements" that employees in his position commonly worked unreported overtime, which was supported by declarations of 20 other employees, because claims varied widely based on employees' skills and their supervisors' management styles, and because claims were scattered across 113 locations and over one hundred supervisors).

Still other courts have conditionally certified classes in off-the-clock overtime cases and then decertified them after discovery. Reed v. Cnty. of Orange, 266 F.R.D. 446, 455 (C.D. Cal. 2010) (decertifying off-the-clock overtime case because individual claims were too diverse, based on experiences that varied from assignment to assignment and from supervisor to supervisor, involving over 100 pay locations); Proctor v. Allsups Convenience Stores, Inc., 250 F.R.D. 278, 283 (N.D. Tex. 2008) (decertifying class in overtime case where depositions revealed the plaintiffs' claims "var[ied] from store to store and manager to manager."); King v. CVS/Caremark Corp., No. 07-21824-CIV, 2008 WL 5973490, at *4 (S.D. Fla.

2008) (decertifying "off-the-clock" overtime case , where plaintiffs alleged they were required to run errands before and after clocking in, because the 16 plaintiffs worked in different stores and were answerable to different supervisors); <u>Smith v. Micron Elecs., Inc.</u>, No. CV-01-244, 2005 WL 5336571, at *2 (D. Idaho Feb. 4, 2005) (decertifying off-the-clock overtime collective action, despite some evidence that there was "pressure for sales representatives to work off-the-clock and some supervisors . . . permitted off-the-clock work," because the plaintiffs' deposition testimony revealed diverse claims implicating only a handful of the defendant's thirty-one supervisors).

Here the plaintiffs have put forth little effort to demonstrate that the members of their proposed class are similarly situated. But the pre-certification standard is low and there are plausible, albeit scant, facts to support the similarity required and the Court exercises its discretion to conditionally certify Plaintiff's proposed class.[21] Like the plaintiffs in <u>Reed</u>, <u>Proctor</u>, <u>King</u>, and <u>Smith</u>, Plaintiffs will have an opportunity to conduct discovery and obtain factual support for their

---

[21] The Court will require the parties to submit a detailed discovery plan that will permit the Court to closely manage the discovery process in this case. It will be efficient to proceed collectively in this case, at least initially. The pool of potential opt-in plaintiffs appears to be small and the number of managers also is apparently limited.

allegations that the proposed class faced similar encouragement and incentives to work more than 40 hours per week without reporting their overtime hours. Since liability will likely depend largely on the practices and conduct of individual managers, it should be relatively efficient to determine the existence or non-existence of a common nexus uniting the claims of employees supervised by different managers. Unlike cases denying certification because there was only a single or a few declarations, there are 14 declarations in this case stating that employees felt pressured to work unreported overtime. This reasonably supports that Plaintiffs' case is based on allegations of a wider pattern of misconduct. What is not known is by how many managers these declarants were supervised and what specifically these managers communicated to SMPs that persuaded them to ignore the company policy against overtime. By conditionally certifying this case as a collective action, the parties can determine who the adverse claimants are, the basis for their claims, and whether there are similar issues of fact or law uniting them. The Court, albeit reluctantly, grants Plaintiffs' motion to conditionally certify a collective action.

### 3. Notice

The purpose of conditionally certifying an FLSA collective action is to facilitate notice to potential opt-in plaintiffs. See <u>Hoffman-La Roche Inc. v.</u>

Sperling, 493 U.S. 165, 169-70 (1989). District courts have discretion to authorize and oversee the notice process, including authorizing discovery about potential plaintiffs and monitoring the preparation and distribution of the notice to ensure that it is timely, accurate, and informative. See id. at 171-72; Maddow v. Proctor & Gamble Co., 107 F.3d 846, 854 (11th Cir. 1997).

Plaintiffs suggest their class should consist of all current and former SMPs who worked unreported overtime over the past three years. As discussed above, see supra § II.A, many, and possibly most, current and former SMPs are subject to mandatory arbitration. Those employees are thus ineligible to participate in this collective action, and it would be inappropriate and unnecessary to include them in the class or to send notice of this lawsuit to them.[22] Cf. Delano v. MasTec, Inc., No. 8:10-cv-320, 2011 WL 2173864, at *6 (M.D. Fla. June 2, 2011) (refusing to authorize court-supervised notice to potential opt-in plaintiffs where the plaintiffs

---

[22] The Court noted previously that a potential plaintiff who signed an arbitration agreement or acknowledgment that is subject to the law of a state that is different from that of any current Plaintiff may seek to join this litigation upon a motion supported by adequate authority that their state would not enforce the arbitration agreement. See supra note 17. Potential claimants who are subject to arbitration are otherwise precluded from opting into this action. In the absence of any argument or authority that any state would apply its contract law materially different than Georgia, and since Plaintiffs waived their opportunity to contest the enforceability of the agreements under state law, the Court concludes that is not appropriate to conditionally certify a collective action consisting of SMPs who are subject to written agreements to arbitrate on an individual basis.

were only able to identify three potential opt-ins not subject to mandatory

arbitration). The conditional class is therefore limited to current and former SMPs

who worked overtime hours for which they were not paid during the past three

years and who are not required to submit their claims to arbitration. Notice is

similarly limited to current SMPs and former SMPs who worked at Amerisave in

the last three years who did not agree to arbitration.

Amerisave argues that notice is not necessary in this case because Plaintiffs'

counsel have already undertaken efforts to contact SMPs about this lawsuit,

including by sending individual letters and e-mails. The extent of these

communications in proportion to the class of SMPs who should receive notice is

unknown. The Court agrees that it is not appropriate to inundate potential opt-in

claimants with multiple offers to join this lawsuit. Fairness is, however, promoted

by sending a single, court-approved notice to SMPs who may be permitted to opt

into this action. A notice is particularly appropriate in this case in light of the

confusion that has been created by Facebook advertisements, and other social

media postings, about the litigation and who may or may not be able to opt into the

case. The parties shall confer to agree upon a form of notice. The proposed notice

form shall be submitted to the Court, on or before December 8, 2011, for the

Court's review and approval. The parties also are responsible for conferring about

and agreeing on the list of individuals to whom notice will be given. The list also should be submitted to the Court on or before December 8, 2011.[23]

## III. CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Amerisave's Motion to Compel Arbitration [17] is **GRANTED IN PART** and **DENIED IN PART**. The Court **GRANTS** Amerisave's motion to compel arbitration. The named and opt-in plaintiffs who signed employment agreements and acknowledgments indicating their agreement to arbitrate their employment disputes with Amerisave, must arbitrate their claims raised in this case, and this case is stayed as to those particular plaintiffs. The parties also are required to submit their dispute about class arbitration to arbitration. The motion is **DENIED** with respect to SMPs who did not agree to arbitration.

**IT IS FURTHER ORDERED** that Amerisave's request to stay this action is **DENIED**.

---

[23] The proposed Notice submitted by Plaintiffs is a good starting point to begin the discussion between the parties. The Court notes, however, that there are a variety of typographical errors in the proposed Notice and for this reason alone it must be revised. The Court notes that consents to join should be filed within 45 days of this Order, rather than 90 days.

**IT IS FURTHER ORDERED** that Amerisave's Motion for Leave to File Surreply in Opposition to Plaintiffs' Motion for Conditional Certification [42] is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Conditionally Certify a Class [21] is **GRANTED IN PART** and **DENIED IN PART**. The Court conditionally certifies a class of former and current SMPs who were not paid for their overtime hours in the past three years and who did not agree to arbitrate their claims. All other SMPs who agreed to arbitrate their dispute are precluded from opting into this action except upon the filing and granting of a motion consistent with this Order (see footnote 17). The Court authorizes notice to be sent to SMPs who worked for Amerisave within the past three years and who did not agree to arbitrate their claims by signing the employment agreement containing the arbitration agreement or the acknowledgment of the arbitration policy. The parties shall, on or before December 8, 2011, submit to the Court for review and approval (i) their proposed notice to class members, and (ii) the list of SMPs to whom notice is proposed to be sent. The motion is **DENIED** with respect to SMPs who agreed to arbitration.

**SO ORDERED** this 23rd day of November, 2011.


_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE