IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| JEFFREY ZULAUF, JASON ZULAUF, and KAL WAYMAN, on behalf of themselves and all similarly situated individuals, | |
| Plaintiffs, | |
| v. | 1:11-cv-1784-WSD |
| AMERISAVE MORTGAGE CORPORATION, | |
| Defendant. | |

## OPINION AND ORDER

This matter is before the Court on Defendant's Motion to Decertify Collective Action [185].  Also before the Court are Plaintiffs' Motions to Strike Consents [147, 148, and 149] and Defendant's Motion for an Order Compelling Arbitration [154].

## I.    BACKGROUND

This case is about alleged violations by Defendant Amerisave Mortgage Corporation ("Amerisave") of the overtime provisions of the Fair Labor Standards Act ("FLSA").  Amerisave is a retail mortgage lender headquartered in Atlanta, Georgia.  Named Plaintiffs Jeffrey Zulauf, Jason Zulauf, and Kal Wayman

("named Plaintiffs") formerly worked for Amerisave as Senior Mortgage Processors ("SMPs"). Plaintiffs allege that, during the three (3) years preceding the filing of this action, they routinely worked overtime at Amerisave without receiving overtime compensation. They seek to represent a collective class consisting of all current and former Amerisave employees who worked as SMPs and were not paid overtime to which they were entitled.

A.    Overview of SMP Job Duties and Plaintiffs' Allegations[1]

Amerisave's business involves advertising and selling mortgage loans direct to the public. This operation is divided between the call center and outside sales. The outside sales department directly solicits business. This case involves the call center, which provides services to customers who contact Amerisave.

Plaintiffs were SMPs who staffed the call center. SMPs provide assistance to customers before and after they apply for a loan. Before the loan application, SMPs help "navigat[e] potential customers through [Amerisave's] website so that they can apply for a loan." (Brown Decl. [32-2] ¶ 3.) The SMPs "provide customer service, act as a point of contact for customers and collect documents

---

[1] In its November 23, 2011, Order on arbitration and conditional class certification, the Court provided a detailed overview of Plaintiffs' allegations and of the job duties of SMPs. (See generally Order [92] at 2–11.) The information relevant to the present motion, which does not appear to be disputed, is recounted here.

needed to process loans."  (Id.)  SMPs do not take loan applications or discuss rates

or fees.  Once a customer initiates a loan process, SMPs "work with the customer

to help gather documents to complete the loan process."  (Id. ¶ 4.)

A few SMPs work in Amerisave's Atlanta headquarters, but most work

directly from their home, and there are SMPs working from nearly every state in

the contiguous United States.  To perform their job duties from home or

Amerisave's office, SMPs must log onto special software provided by Amerisave,

which Amerisave refers to as its Customer Relationship Management System

("CRM System").  Once SMPs enter into this system, they are able to interact with

potential or current Amerisave customers that are assigned to the SMP by the CRM

System in one of two ways.  Sometimes, SMPs receive chat messages from a

customer browsing Amerisave's website, and the SMP will interact with the

customer by typing messages through the chat interface.  More commonly, SMPs

receive incoming phone calls from customers or potential customers.  This occurs

when a customer calls Amerisave's general sales phone number, which routes the

call through the CRM System to one of the SMPs currently logged onto the

system.  SMPs cannot communicate with customers or perform their duties without

being logged into Amerisave's CRM System.

SMPs are divided into teams and each team has a different manager.  Over the past two years there have been eleven (11) different teams with eleven (11) different managers.  Each SMP is assigned to one team and typically only interacts with the manager of that team.  A typical SMP team may have between fifteen (15) and forty (40) SMPs.

SMPs are paid a minimum wage draw plus commissions based on the quantity of loans they process.  Over the past few years, SMPs have earned between $30,000 and $150,000.  The SMP position is a fulltime position requiring employees to work forty (40) hours a week.  Amerisave has a policy prohibiting SMPs from working overtime without authorization from their manager.

Amerisave's CRM System contains a timesheet application that employees use to record the hours they work.  When employees log into the CRM System, they only become active and able to perform their job duties when they are "clocked-in."  Once the CRM System registers that an SMP has worked forty (40) hours in a given workweek, the SMP is automatically locked out of the system and prevented from working unless they receive approval to work overtime.  Even when they are locked out of the system, SMPs have the ability to change their timecard to reflect time they worked while not logged into the CRM System or time they were logged into the system but not working.

4

Amerisave also has a policy forbidding employees from underreporting hours.  The time reporting policy states: "It is not acceptable to under-report hours; you must record all hours you are working on Amerisave business."  (Poupart Decl. [32-25] Ex. 1.)  SMPs are required to certify the accuracy of their timesheets each workweek.  The certification form states that it "is required to be completed each workweek to help ensure compliance with company, state and federal regulations."  (Bass Decl. [32-19] Ex. 1.)  The form asks the employee, "Did you keep *accurate records* of your work on behalf of Amerisave?"  (Id.)  The form ends: "By typing your name below, you certify that you have provided truthful responses to all questions on this Compliance Certification."  (Id.)

Plaintiffs allege that they engaged in a pattern of falsifying their timesheets to underreport their hours worked and of falsely certifying the accuracy of their time sheets.  As a result of these unreported hours, Plaintiffs allege that they worked overtime hours for which they were not compensated.

B.    Procedural History

On May 31, 2011, the named Plaintiffs initiated this action by filing a Complaint "on behalf of themselves and all similarly situated individuals" against

Amerisave.[2]  Since then, numerous additional Plaintiffs ("opt-in Plaintiffs") have filed consents to join the lawsuit.

On July 14, 2011, Amerisave filed a motion to compel arbitration and to stay the action as to certain Plaintiffs.  On July 29, 2011, Plaintiffs moved to conditionally certify a class.

On November 23, 2011, the Court entered an Order on both motions.  The Court granted, in part, Amerisave's motion to compel arbitration and ordered certain named and opt-in Plaintiffs, including Kal Wayman, to arbitrate their FLSA claims.  The Court stayed this action as to those Plaintiffs.

The Court also granted, in part, Plaintiffs' motion to conditionally certify a class.  The Court ordered that the remaining Plaintiffs, consisting of former and current SMPs who allegedly were not paid for their overtime hours in the past three (3) years, could proceed as a class.  The Court further authorized notice to be sent to other potential class members to allow them to become opt-in Plaintiffs.  The Court did not preclude Amerisave from moving to decertify the class after the conclusion of discovery.  There currently are approximately 65 opt-in Plaintiffs.[3]

_____

[2] The Complaint also names Amerisave's owner Patrick Markert as a Defendant. On December 12, 2011, the parties stipulated to the dismissal of Markert.

[3] On April 3, 2012, Plaintiffs filed Motions to Strike Consents [147, 148, and 149] filed on behalf of four (4) individuals: those of Stephanie Mogardo (filed June 3,

On June 22, 2012, after the conclusion of discovery, Amerisave filed its Motion to Decertify Collective Action [185], along with numerous exhibits, seeking to decertify the class on the ground that the evidence does not show that the named and opt-in Plaintiffs are "similarly situated."  On August 12, 2012, Plaintiffs filed their opposition to the Motion to Decertify Collective Action and submitted numerous exhibits, consisting of emails obtained in discovery and deposition testimony, that Plaintiffs contend show that the class members are "similarly situated."

## II.   DISCUSSION

### A.   Legal Standard

FLSA requires covered employers to pay non-exempt employees who work more than forty (40) hours in a week an overtime rate of one and one-half times the employee's regular pay rate for all hours worked that exceed forty.  29 U.S.C.

---

2011) [3-1]; Roberta Crawford (filed June 8, 2011) [4-1]; David Smithson (filed March 13, 2012) [139-1]; and Casey Bennett (filed March 20, 2012) [140-5]. Plaintiffs' attorneys erroneously filed these consents in this case, and the individuals are not opt-in Plaintiffs in this matter.  Accordingly, the Court grants Plaintiffs' Motions to Strike Consents.  On April 16, 2012, Amerisave filed its Motion for an Order Compelling Arbitration [154] in which it seeks to stay this action, in favor of arbitration, as to certain opt-in Plaintiffs.  On May 22, 2012, all of the opt-in Plaintiffs who were subject to Amerisave's Motion withdrew their consents to join this action.  Accordingly, Amerisave's Motion is as moot and is denied on that basis.

§ 207(a) (2006).  FLSA imposes liability on employers for violations of the Act's

overtime requirements, and it authorizes employees to bring lawsuits to recover

overtime pay owed.  Id. § 216(b).  Employees may sue individually or they may

bring a collective action on behalf of themselves and other "similarly situated"

employees:

> An action . . . may be maintained against any employer . . . by any one
> or more employees for and in behalf of himself or themselves and
> other employees similarly situated.  No employee shall be a party
> plaintiff to any such action unless he gives his consent in writing to
> become such a party and such consent is filed in the court in which
> such action is brought.

Id.  In contrast to a class action under Rule 23 of the Federal Rules of Civil

Procedure, which generally requires potential plaintiffs to opt-out if they do not

wish to be represented in the lawsuit, a collective action under Section 216(b)

requires potential plaintiffs to affirmatively opt into the lawsuit.  Hipp v. Liberty

Nat'l Life Ins. Co., 252 F.3d 1208, 1216 (11th Cir. 2001).[4]  "The decision to create

an opt-in class under § 216(b) . . . remains soundly within the discretion of the

district court."  Id. at 1219.

---

[4] Hipp involved a collective action under the Age Discrimination and Employment
Act of 1967, but that statute incorporates FLSA's collective action provision, and
Hipp therefore applies in both contexts.  Morgan v. Family Dollar Stores, Inc., 551
F.3d 1233, 1259 n.37 (11th Cir. 2008).

The Eleventh Circuit encourages district courts to perform a two-step process to certify a collective action under Section 216(b).  Id.  In the initial, so-called "notice stage," the question is whether notice of the action should be given to potential class members.  Id. at 1218 (quoting Mooney v. Aramco Servs. Co., 54 F.3d 1207, 1213 (5th Cir. 1995)).  Relying on the pleadings and affidavits submitted by the parties, the court applies a "fairly lenient standard" that "typically results in 'conditional certification' of a representative class.  Id. (quoting Mooney, 54 F.3d at 1213–14).  After conditional certification, potential class members receive notice and an opportunity to opt into the class, and the parties complete discovery.  Id. (quoting Mooney, 54 F.3d at 1213–14).

The second stage is optional and usually occurs if the defendant moves for "decertification" after the completion of all or most discovery in the case.  Id. (quoting Mooney, 54 F.3d at 1213–14).  Based on the more extensive factual record, the court makes a factual determination whether claimants are similarly situated.  Id. (quoting Mooney, 54 F.3d at 1213–14).  "The 'similarly situated' standard at the second stage is less 'lenient' than at the first, as is the plaintiffs' burden in meeting the standard."  Anderson v. Cagle's, Inc., 488 F.3d 945, 953 (11th Cir. 2007) (citing Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1103 (10th Cir. 2001)).  If the plaintiffs demonstrate, by evidence, that all claimants are

"similarly situated," the collective action proceeds on the merits.  See id.  If not, the court decertifies the class, the opt-in plaintiffs are dismissed without prejudice, and the original plaintiffs proceed on their individual claims.  Hipp, 252 F.3d at 1216 (quoting Mooney, 54 F.3d at 1213–14).

      B.    Analysis

      Plaintiffs argue that the named and opt-in Plaintiffs here are "similarly situated" because all claimants were subject to a "unified policy, plan, or scheme" to deprive SMPs of FLSA-required overtime pay.  Plaintiffs do not argue that Amerisave's official overtime policies or procedures violate FLSA.  Rather, they argue that Amerisave has a "company-wide 'policy-to-violate-the-policy' that originates from the owner and top management of the company and which is followed company-wide by mid-level managers."  (Pls.' Br. [191] at 2.)  Plaintiffs specifically contend that Amerisave's top management—Patrick Markert, Carol Poupart, and Robert Wilkes—enforced an unofficial policy requiring all SMPs to work, but not report, overtime and that the claims here are a result of that unofficial policy.

      The Court agrees that, if true, Plaintiffs' allegations would show sufficient similarity of factual and employment settings to support continuing this litigation as a collective action.  See Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1219

(11th Cir. 2001) (recognizing that an illegal "unified policy, plan, or scheme," while not necessary, would show that plaintiffs are "similarly situated"); see also Zivali v. AT&T Mobility, LLC, 784 F. Supp. 2d 456, 463 (S.D.N.Y. 2011) (recognizing that unofficial FLSA-violating "practices" and "culture," if "uniform and pervasive," would warrant class treatment); Pacheo v. Boar's Head Provisions Co., 671 F. Supp. 2d 957, 960–61 (W.D. Mich. 2009) (recognizing that "plaintiffs are similarly situated when they suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs" (internal citation omitted)).

At this second stage of the certification process, the Court does not rely on Plaintiffs' allegations but evaluates the evidence proffered by Plaintiffs to establish the existence of the alleged top-level "policy-to-violate-the-policy" with respect to SMPs.  Plaintiffs submit various emails and portions of various depositions to support their theory.  The Court evaluates the extent to which each supports Plaintiffs' theory of a top-level "policy-to-violate-the-policy" with respect to SMPs.

1.     *Evidence regarding Patrick Markert*

Plaintiffs submit evidence, in the form of emails and deposition testimony, that Patrick Markert, Amerisave's owner, gave Kal Wayman, a named Plaintiff,[5] permission to underreport hours.  (Pls.' Ex. 3 [191-3] at 7–8; Pls.' Ex. 8 [191-4] at 18.)  The record shows, however, that Wayman was not a full-time SMP.  (Def.'s Ex. 27 [185-27] at 49–50.)  Wayman also was a recruiter of SMPs for Amerisave, and he spent more than half his time in that role.[6]  (Id.)  The Court cannot conclude that this evidence of an express exception to company policy granted to Wayman is evidence of a company-wide "policy-to-violate-the-policy" with respect to SMPs generally.  The Court further finds that Wayman's bifurcated responsibilities, the most significant portion of which were acting as a recruiter and not as an SMP, support that he is not similarly situated to other SMPs.

Plaintiffs also point to an email between David Ryan[7] and Markert regarding compensation for Amerisave's underwriters.  (Pls.' Ex. 3 [191-3] at 10.)  Ryan writes, "Do you realize the hours they work daily, including weekends?"  (Id.)

---

[5] As noted above, this action is stayed as to Wayman pending arbitration.

[6] In one of the emails referenced by Plaintiffs, Wayman's signature block identifies him as "National Sales Director," not an SMP.  (Pls.' Ex. 3 [191-3] at 8.)

[7] Plaintiffs do not identify Ryan's position within Ameriprise.

Plaintiffs do not contend that SMPs are underwriters, and the available evidence, and common sense, suggest that "SMP" and "underwriter" are different positions with distinctly different functions.  (See Dep. C. Poupart 40:2–10 (Mar. 1, 2012), Def.'s Ex. 32 [185-32] at 40 (distinguishing underwriters' job duties from those of SMPs).)[8]  The Court concludes that this email is not evidence of an alleged policy-to-violate-the-policy with respect to SMPs.

2.    *Evidence regarding Carol Poupart*

Plaintiffs submit emails to and from Carol Poupart, Amerisave's President, in an attempt to show that Poupart "participate[d] in directing employees to underreport their hours."  The first is an email written by SMP Jon Caffery to Robert Wilkes, Amerisave's Vice President of Sales.  (Pls.' Ex. 3 [191-3] at 12.)  In it, Caffery writes that an unidentified SMP had stated in a meeting that he was working "a lot" and probably more than forty (40) hours per week.  (Id.)  Wilkes forwarded the email to Poupart, and Poupart responded, "Hmmm, hopefully he does drop it."  (Id.)  Contrary to Plaintiffs' argument, this email does not establish that an SMP was actually working overtime, let alone that Poupart had directed

---

[8] The Court also notes that, even if this email refers to SMPs, it shows only that David Ryan suggested to Markert that SMPs work a lot of hours, without specifying a quantity.  This is not evidence that a policy requiring unreported overtime hours emanated from Markert.

any employee to work overtime or underreport hours.  It at most shows that this unidentified SMP was working hard, and there is at most only Caffery's speculation that it was more than forty (40) hours.  The Court cannot conclude that this email is evidence of an alleged policy-to-violate-the-policy.

Plaintiffs submit another email from Caffery, to various Ameriprise managers, including Poupart, Markert, and Wilkes.  (Pls.' Ex. 3 [191-3] at 14–17.) This email is a long litany of complaints, including an accusation that mid-level managers are instructing SMPs on how to underreport hours.  (Id.)  The email does not accuse senior management of wrongdoing or otherwise demonstrate wrongdoing on their part.  In her replies to Caffery's email, Poupart expressly denies a company policy to encourage underreporting hours, and she stated that the company would investigate Caffery's allegations.[9]  (Pls.' Ex. 3 [191-3] at 19, 22–23.)  Poupart also sent an email to all SMPs to remind them of Amerisave's policy requiring accurate time reporting and prohibiting overtime.  (Def.'s Ex. 3 [183-3] ¶ 10.)  This evidence is used by Plaintiffs to argue, at most, a speculative inference that the top management had "notice" of instructions given by unnamed mid-level managers to unnamed SMPs.  The Court concludes that this email is not evidence of the alleged company-wide policy-to-violate-the-policy regarding SMP overtime

_____

[9] Plaintiffs claim that Poupart did not follow through on the investigation.

hours, including because Caffery was told the alleged underreporting would be investigated, thus informing the workforce that the conduct alleged was not permitted, and because of the directives sent by email that all employees are required to report hours worked accurately and that overtime was prohibited.

Plaintiffs next submit an email from SMP George Nikolaou to Poupart and Wilkes in which Nikolaou offers various suggestions to improve SMP performance.  (Pls.' Ex. 3 [191-3] at 27–28.)  In one paragraph, Nikolaou suggests that he and fellow SMPs work far more than forty (40) hours per week:

> [D]o you know how many hours the top performers put in to make $10,000 - $15,000 per month!  It's literally 2 full time jobs!  I myself are glued to my computer all day long and I know all the others are too! . . . [D]o you honestly know how many hours **we really work** to close 20 or 30 loans??  It's at least 2 full time jobs!  If you really restricted everyone to 40 hours, I assure you Amerisave's production would be cut in half!

(Id.)  Wilkes responded to this email by replying to Nikolaou and to Nikolaou's direct manager.  He told Nikolaou that working over forty (40) hours per week is prohibited, and he instructed the manager to have a team meeting to review the company overtime policy with all of the SMPs in her group.  (Def.'s Reply Ex. 1 [195-1] at 5, 7–8.)  Nikolaou's email does not support the existence of an alleged policy-to-violate-the-policy since the suggestion that SMPs were working overtime

prompted Wilkes to state that overtime is prohibited and to issue a directive that the manager train her group on the company's overtime policy.

        3.    *Evidence regarding Robert Wilkes*

Plaintiffs submit emails and deposition testimony in support of their contention that Robert Wilkes, Amerisave's Vice President of Sales, required or encouraged SMPs to underreport hours. Plaintiffs first offer three (3) emails written by Wilkes. The first is a broadcast email within the company stating that Amerisave is hiring new SMPs and asking for referrals. (Pls.' Ex. 3 [191-3] at 31.) In it, Wilkes lists the information that applicants should submit, including whether the applicant has "any limitations in the hours [he] can work." (Id.) The second email, from Wilkes to all SMPs, contains various criticisms of SMPs' performance and threatens demotion or termination for failure to perform to expectations. (Pls.' Ex. 3 [191-3] at 32.) In it, Wilkes writes, "You do not work enough hours as tracked by your time logged in CRM and/or on the phone." (Id.) In the third email, Wilkes forwards to Poupart a request from an SMP for time records to use in an MBA course that the SMP is taking. (Pls.' Ex. 3 [191-3] at 33.) Wilkes recommends not providing the information "for legal or compliance type reasons." (Id.) Despite Plaintiffs' interpretation of these emails as conjectural support of their litigation theory, the emails plainly do not show that Wilkes encouraged or

participated in a plan to have SMPs underreport hours.  These emails are not

evidence of an alleged policy-to-violate-the-policy.

Plaintiffs next submit deposition testimony of Derek Van Dam.  Van Dam

testified that he was an SMP and later was given recruiting responsibilities.  (Pls.'

Ex. 15 [191-4] at 67.)  Van Dam testified that, after becoming a recruiter, Wilkes

told Van Dam to work "as many hours as you want."  (Id.)  Van Dam further

testified that Wilkes told Van Dam how to circumvent the time-keeping system to

work over forty (40) hours without recording overtime.  (Id. at 68–71.)  Van Dam's

testimony is relevant to Wilkes' treatment of Van Dam as a recruiter, is not

relevant to Wilkes' treatment of SMPs generally, and does not support that Van

Dam is similarly situated to other SMPs.  The Court does not find that the

testimony evidences an alleged policy-to-violate-the-policy with respect to SMPs.

Plaintiffs next submit deposition testimony of SMP Jon Caffery.  Caffery

testified that Wilkes "was very adamant about not working overtime when he was

talking directly to you on the phone or writing you an e-mail."  (Pls.' Ex. 16 [191-

4] at 73.)  Caffery further testified that other employees, whom Caffery referred to

as Wilkes's "golden boys," told Caffery to work, but not report, overtime.  (Id. at

74.)  Although Caffery and Plaintiffs suggest that the "golden boys" were working

at the direction of Wilkes, Caffery does not explicitly state this, and Plaintiffs do

17

not present evidence identifying the "golden boys" or that Wilkes supervised them. The Court does not find that Caffery's testimony evidences an alleged policy-to-violate-the-policy.

Plaintiffs next submit deposition testimony of named Plaintiffs Jason Zulauf, Jeffrey Zulauf, and Kal Wayman.  Each of these Plaintiffs testified that Wilkes instructed them to underreport hours.  (Pls.' Ex. 8 [191-4] at 21; Pls. Ex. 10 [191-4] at 31–33; Pls.' Ex. 11 [191-4] at 37–38.)  As noted above, Wayman was not a full-time SMP, and the Court cannot conclude that his testimony, regarding what Wilkes told him, is evidence relevant to all SMPs.  As for the Zulaufs' testimony, the Court agrees that it supports Plaintiffs' allegation of a policy-to-violate-the-policy.  However, standing alone, the testimony of the named Plaintiffs is not sufficient at the second stage of certification to establish Plaintiffs' theory that there is an identifiable proposed class of similarly situated persons.  Cf. Anderson, 488 F.3d at 953 (holding that, at the second stage, plaintiffs must present evidence beyond their own allegations and affidavits).

### 4.   *Evidence regarding Amerisave's IT Department*

Plaintiffs submit deposition testimony of SMPs Joseph Chiofalo and He Le Dao.  Both testified that Bill Wood, an IT Department employee,[10] instructed them

---

[10] There is no evidence that Bill Wood is a manager.

to retroactively change their hours in order to be able to access the computer system after logging forty (40) hours.  (Pls.' Ex. 17 [191-4] at 78–79; Pls.' Ex. 18 [191-4] at 81–82.)  The testimony certainly does not show that the senior management played a role in the deponents' changing of their work hours, and this also is not evidence of the alleged policy-to-violate-the-policy.

> 5.   *Evidence regarding individual SMP-managers*

Plaintiffs submit deposition testimony of many different SMPs, along with numerous emails, to show that individual SMP-managers enforced hour-underreporting policies among their individual teams.  From this evidence, there are only scant direct allegations of three (3) of the eleven (11) SMP-managers enforcing or encouraging a policy of not reporting worked overtime.  (See Pls.' Ex. 21 [191-4] at 90–92 (testimony that manager Dustin McCain instructed SMP to work, but not report, overtime); Pls.' Ex. 22 [191-4] at 94–96 (testimony that manager Darla Castillo instructed SMP not to report overtime hours worked); Pls.' Ex. 25 [191-4] at 112–14 (testimony that manager David Grill instructed SMP to alter time records so as not to report overtime hours worked).)  Even considering these few direct allegations, this SMP-manager evidence shows only, at most, that some, but not all, SMP-managers instituted or encouraged a FLSA-violating policy.  This evidence does not show the existence of Plaintiffs' alleged policy-to-

violate-the-policy emanating from Amerisave's top management and does not show that the claimed policy—assuming there was one—resulted in a similarly situated class of SMPs generally.[11]  The Court cannot conclude that the SMP-manager evidence supports that an alleged top-level, pervasive policy-to-violate-the-policy or that SMPs are similarly situated.

Although Plaintiffs assert that the named and opt-in Plaintiffs are "similarly situated" because they all were subject to a top-level policy-to-violate-the-policy requiring SMPs to work, but not report, overtime hours, the evidence proffered by Plaintiffs does not show the existence of such a policy and does not support that SMPs are similarly situated.  The other evidence in the case shows the contrary—that SMPs were *not* similarly situated because they had different understandings of

---

[11] Other SMP testimony, submitted by Amerisave, shows that individual SMPs had varying understandings of Amerisave's official overtime policies and that they violated the policies for different reasons.  For example, one SMP testified that she underreported hours because she believed that, if she reported more than forty (40) hours, she would have been locked out of the CRM System without recourse.  (Def.'s Ex. 6 [185-6] at 54–56.)  Another SMP testified that he underreported hours because he did not want Amerisave to know that he was violating company overtime policy.  (Def.'s Ex. 11 [185-11] at 83.)  And another SMP testified that he worked, but did report, overtime because he wanted to make more money.  (Def.'s Ex. 25 [185-25] at 59.)  This varying testimony affirmatively demonstrates that these SMPs are not similarly situated.

the stated "do not work over 40 hours" policy and that some, aware of this policy, chose on their own to violate it.

The Eleventh Circuit has instructed that a district court may evaluate other factors at the second stage of collective action certification, including "the various defenses available to defendants that appear to be individual to each plaintiff . . . and . . . fairness and procedural considerations." Morgan, 551 F.3d at 1261 (quoting Anderson, 488 F.3d at 953) (alterations omitted). The Court does not reach these factors here because the evidence does not establish that Plaintiffs are "similarly situated" in the first place. See id. at 1262 ("[U]ltimately, whether a collective action is appropriate depends largely on the factual question of whether the plaintiff employees are similarly situated to one another."). Nevertheless, the Court agrees with Amerisave that these additional factors favor decertification. Amerisave argues that its defenses are individualized because its liability to each Plaintiff turns, in part, on its knowledge of each Plaintiff's unpaid overtime work. The Court agrees that, absent evidence of a FLSA-violating company-wide policy (or policy-to-violate-the-policy), Amerisave's knowledge of *each* SMP-Plaintiff's overtime is relevant, and such individualized defenses favor decertification. See, e.g., Zivali, 784 F. Supp. 2d at 467–68 ("[T]he defenses available to [defendant] appear to be highly individual to each plaintiff. For example, plaintiffs must

demonstrate that [defendant] had actual or constructive knowledge of the off-duty work performed.  In the absence of a company-wide policy or practice, plaintiffs will have to demonstrate that each individual manager had actual or constructive knowledge that plaintiffs were performing off-the-clock work without proper compensation." (internal citation omitted)).  Because of the individualized nature of Plaintiffs' claims, fairness and procedural considerations also warrant decertification.  Cf. Grayson v. K-Mart Corp., 849 F. Supp. 785, 791 (N.D. Ga. 1994) (holding that a trial involving separate factual situations for each plaintiff "would be intolerable").

## III.   CONCLUSION

Although some of the evidence shows that various Amerisave managers may have had knowledge that some SMPs were working unreported overtime, Plaintiffs have not presented any evidence, other than testimony of two named Plaintiffs, that Amerisave's top management created and enforced a policy of SMPs underreporting hours.  The Court cannot conclude that the named and opt-in Plaintiffs are "similarly situated" in the manner Plaintiffs assert, and Plaintiffs have not carried their burden to demonstrate that this case should proceed as a collective action.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion to Decertify Collective Action [185] is **GRANTED**.  All claims asserted in this action by opt-in Plaintiffs are **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motions to Strike Consents [147, 148, and 149] are **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for an Order Compelling Arbitration [154] is **DENIED AS MOOT**.

**SO ORDERED** this 29th day of November, 2012.


WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE